I «SOL GOTHARD, Judge.
The plaintiffs, Wanda Marks, individually and as the administrator of her minor child, Antoinette Love, appeal from the trial court’s judgment finding for defendants Jerome Jenkins and his insurance company, State Farm Insurance Company and dismissing all claims found in plaintiffs’ suit. For the reasons that follow, the judgment of the trial court is affirmed.
The plaintiffs filed a “Petition for Personal Injuries and Damages” against defendants, alleging that Wanda Marks and passenger Antoinette Love (Ms. Marks’ then less than one year old granddaughter) were entering the parking lot at River Parish Hospital in St. John the Baptist Parish when, suddenly and without warning, defendant Jerome Jenkins backed out of a parking space and struck Ms. Marks’ vehicle causing Ms. Marks and Ms. Love to sustain serious personal injuries and damages.
We note that there is confusion over the relationship between Ms. Marks and Antoinette Love. In the petition it is alleged that Antoinette Love is the minor child of Ms. Marks. However, at trial Ms. Marks testified that Antoinette is her [ ^grandchild and gives no indication that she either obtained legal custody of, or adopted the child. Since defendant has not raised the dilatory exception of lack of procedural capacity pursuant to La. C.C.P. Art. 926, any questions of procedural capacity are waived and will not be considered by this court. La. C.C.P. Art. 926B.
After a trial on the merits the trial court found in favor of the defendants and dismissed plaintiffs’ suit. It is from that judgment that plaintiffs appeal.
*560 At trial plaintiff Wanda Marks testified as follows: Ms. Marks stated that on November 30, 2001 she and her granddaughter Antoinette Love were involved in a motor vehicle accident in the parking lot of River Parish Hospital in LaPlace. She was on her way to visit a relative in the hospital but could not remember who it was. Ms. Marks “pulled into the parking lot and came to a complete stop, waiting on the driver that was in the parking lot to come out, and he just backed into me,” the back part of his car hitting the front part of her car, causing damage to her car. When asked what happened to her body, Ms. Marks stated that she remembered “just a quick jerk and going.” When asked if she was aware of whether her granddaughter was hurt or not, she stated that “[s]he was just crying.” Ms. Marks was not certain whether her granddaughter was in a child-restraining seat or sitting in the passenger’s seat of the car with a seatbelt on. She stated that she was preparing to get out of the car to go into the hospital and could not remember if she had already “unstrapped” the baby to get out of the car. Ms. Marks testified, “I don’t know if I took her out of the car seat at the time, or if I just unbuckled her or what. I’m not sure what I was doing.” She further stated that she was not sure what happened inside the car, but recalled her granddaughter screaming and about five or six people coming to the car, including defendant, Jerome Jenkins.
According to Ms. Marks neither she nor the police noted the names of the people who came to her car after the accident. She testified that she spoke briefly |4to Mr. Jenkins before he left and told him she was going to call the police. On cross-examination Ms. Marks testified that she did not remember Mr. Jenkins offering to call the police on his cell phone. When the police arrived she explained to them what happened. On cross-examination, Ms. Marks was not sure if the police took her name, nor was she sure whether they asked her if she was hurt. She stated, “I’m not sure what I told the police at that time.” Included in evidence is a completed St. John the Baptist Sheriffs Office “Private Property Crash Report” indicating that there was no property damage and that the condition of the plaintiff driver was normal. She testified that the damage to her vehicle was medium and said that she later gave the vehicle to her sister, without having it repaired. She further testified that she did not look at Mr. Jenkins’ vehicle, was not sure if she got out of her vehicle, and did not know whether Mr. Jenkins had any damage to his vehicle or not.
After speaking to the police she went to the emergency room. Included in evidence are Ms. Marks’ medical records from River Parishes Hospital, including emergency room records. There is no record of an emergency room visit on November 30, 2001. Ms. Marks testified that she was not sure where she was experiencing pain at the time of her emergency room examination. She testified that the emergency room physician told her to follow up with the chiropractor (Dr. Dale) she was already seeing for an on-the-job injury to her right leg. But on cross-examination Ms. Marks was asked “Didn’t you hurt your leg in an accident at work after this accident, not before?” At first Ms. Marks stated that she was not sure. On further cross-examination she agreed that her earlier testimony, stating, in effect, that she had hurt her leg before this accident, was incorrect. She later testified that after this motor vehicle accident she settled a worker’s compensation claim for her on-the-job leg injury, receiving money and payment of her medical bills.
|BOn direct examination Ms. Marks stated that when she saw Dr. Dale after the *561 accident, her back was hurting her, and her right leg and knee were giving her trouble. She further stated that Dr. Dale was treating her for her lower back and neck in connection with the car accident and that he had an MRI and a lot of x-rays done. On cross-examination Ms. Marks denied that she already had problems with her neck and back before she became a patient of Dr. Dale. When asked on cross-examination if she had ever been to River Parish Hospital regarding her neck and back before the accident, Ms. Marks testified that she could not remember if she did. Later, when asked if she remembered going to the emergency room at River Parishes Hospital on December 23, 1999, and complaining of neck pain, Ms. Marks replied that she was not sure of that but that if the record reflects that she went there and her “signature is on the paper” she would not dispute those records.
Included in evidence is a record of Ms. Marks’ December 23, 1999 admission to River Parishes Hospital Emergency Room for neck and back pain. When defense counsel asked if she had ever hurt her back before the accident, Ms. Marks replied that she was not sure if she did. During cross-examination defense counsel referred to Dr. Dale’s report stating that Ms. Marks had a history of back pain.
In evidence was an April 18, 2002 letter from Dr. Dale to plaintiffs’ counsel regarding Ms. Marks. Dr. Dale stated “she further states that she does have lumbosacral pain, but that it was present prior to the accident [November 30, 2001], and that the accident made it somewhat worse.” Defense counsel also referred to Ms. Marks’ deposition, specifically her answering “no” to the following questions: “Did you ever have any problems with your neck or back before this accident?” and “Have you ever been treated for your neck or back before this accident?” When asked about the conflicting statements, Ms. Marks replied “I’m telling the truth. If I answered “no” or “yes” to a question, or something prior to | fiiny history, maybe I was confused. I don’t — I don’t — I can’t remember back that far.”
On direct examination Ms. Marks testified that she saw specialists “Dr. Phillips, Dr. Addatto” after Dr. Dale’s tests. On cross-examination she denied that she only saw Dr. Adatto, and not Dr. Phillips. She remembered meeting Dr. Phillips and Dr. Adatto. On direct examination Ms. Marks testified that after her visit to the specialists, she understood that she was suffering from back and right leg problems.
Defendant Jerome Jenkins also testified at trial. His testimony is as follows: On November 30, 2001 he was backing out of a parking spot at River Parish Hospital parking lot when he observed a gentleman getting in a truck parked on the side of him, getting ready to leave, and a stopped car in the driveway, “more or less waiting for a parking spot to become available to park.” According to Mr. Jenkins he had enough space to turn his car without getting anywhere near Ms. Marks vehicle. He stated that he would have had to back up at least 30 feet from where his car was parked to hit Ms. Marks and that he only backed up approximately 15 or 20 feet, after which his vehicle was then straight to drive forward out of the parking lot. Mr. Jenkins could not say whether his vehicle came into contact with plaintiffs vehicle, but did not feel any impact. Under cross-examination, Mr. Jenkins testified that his car brakes “when you applied them, they hit kind of hard” and if “you were getting on them pretty hard, you could feel a tap, and I didn’t feel a jolt or an impact, just the brakes of the car that I knew I’d been driving for two years.”
*562 According to Mr. Jenkins, after backing out he stopped to go forward, but hesitated because the gentlemen in the truck next to him was getting ready to back out. He observed in his rearview mirror that the car behind him was not proceeding and thought maybe something had happened so he decided to check it l7out. Mr. Jenkins estimated that when he stopped and got out of his car Ms. Marks’ ear was between 15 and 20 feet from his. He did not recall moving his car forward after he realized Ms. Marks was behind him. Under cross-examination Mr. Jenkins testified that he did not think he hit Ms. Marks because “[t]here was no impact, like you would feel an impact when you’re backing into something or if you hit something.” He further stated that he got out of his car to talk to Ms. Marks because “I saw her there. I saw the expression on her face. It could have been from fright, thinking I was going to hit her. I don’t know. Like I said, I don’t think I hit her.”
Mr. Jenkins testified that he looked at both his vehicle and Ms. Marks’ and observed no damage to either one. He further testified that there were photographs taken of his vehicle (included in evidence) just after the accident and that they do not show any damage to his vehicle. According to Mr. Jenkins, when he got to Ms. Marks’ vehicle Antoinette Love was trying to sit or stand up in the seat, with the seatbelt still on her. Mr. Jenkins stated that he then asked Ms. Marks what happened, and she said that he backed into her car and that it happened so fast that she did not have time to blow the horn, back up or do anything else. Mr. Jenkins then asked Ms. Marks if she was all right and she said “ ‘I’m fine.’ ” He offered to call the Sheriffs Office on his cell phone. According to Mr. Jenkins, Ms. Marks told him that if there was no damage there was no need for a report and that she was going to the hospital to see one of her relatives in intensive care. Mr. Jenkins testified that he remained for a few more minutes to make sure she was all right, talking to Antoinette Love, who had been crying, and then left. Mr. Marks did not hear anything more about the incident until two months later when a State Farm adjustor called him and told him that a claim had been filed against him and his insurance policy for a wreck that supposedly happened in the River Parish Hospital parking lot.
| RPlaintiffs introduced into evidence medical records from Robert R. Dale, D.C., a chiropractor consulted by Ms. Marks and Antoinette Love after November 30, 2001. Included in these records are three letters that Dr. Dale wrote to plaintiffs’ counsel regarding Ms. Marks and Ms. Love. In a letter dated April 18, 2002, Dr. Dale stated that Ms. Marks originally presented to his office on December 1, 2001. Ms. Marks told him she was involved in a motor vehicle accident on November 30, 2001 and complained of “cervical and upper thoracic pain, muscle spasms, burning in between her shoulders, right hand and tingling.” She further stated that she had lumbosacral pain, but that it was present prior to the accident, and that the accident made it somewhat worse. Dr. Dale’s diagnosis was cervical and lumbosacral sprain/strain injuries, muscle spasm, myalgia, and post traumatic hip bursa swelling. Dr. Dale treated Ms. Marks from December 1, 2001 through February 11, 2002, after which time she voluntarily withdrew from care. Dr. Dale stated that although Ms. Marks continued to be symptomatic she said she had improved considerably.
In a second letter to plaintiffs’ counsel dated February 4, 2003, Dr. Dale made an addendum to his April 12, 2002 narrative report stating that Ms. Marks returned for treatment on April 30, 2002 because of *563 continuing pain in the cervical and lumbo-sacral areas. She also reported to Dr. Dale that she lifted a light object at work and it had caused an increase in her lum-bosacral and hip pain. According to Dr. Dale a May, 2002 MRI indicated some degenerative condition had occurred at the lumbosacral disc with a certain amount of spurring. Dr. Dale treated Ms. Marks through July 8, 2002 and then referred her to Dr. Stuart Phillips. Dr. Dale’s prognosis for Ms. Marks was guarded.
In a third letter to plaintiffs’ counsel dated April 1, 2002 Dr. Dale stated that Antoinette Love was evaluated in his office on December 12, 2001 pertaining to injuries she received in a November 30, 2001 motor vehicle accident. According 19to Dr. Dale the “mother” stated that the baby was a front seat passenger in a seat belt in a car when another vehicle backed into the front of them causing the child to be thrown backward and forward. And she noted that following the accident Antoinette was having difficulty sleeping. Ms. Love was diagnosed with thoracic sprain/ strain injuries, muscle spasm, and myalgia, all probably self-correcting in Dr. Dale’s opinion. He asked that the child return in two weeks to make sure that the problems had indeed corrected themselves. The child did not return for additional treatment so he surmised that they had. He stated that the child will continue to do well.
As noted earlier there is confusion over the relationship between Ms. Marks and Antoinette so it is unclear whether Dr. Dale was referring to Ms. Wanda Marks when he referenced the child’s “mother.”
Also included in evidence was the deposition of Dr. Stuart Phillips, an expert in the field of orthopedic surgery. It should be noted that Dr. Phillips has never examined Ms. Marks. All of his testimony was based on a review of Ms. Marks’ chart. According to Dr. Phillips, Ms. Marks first presented to an associate of his on November 25, 2002 with a history of an accident in January of 2002. When questioned about the above date, Dr. Phillips said that at her initial visit Ms. Marks had been unclear about the date of her accident except that she thought it was in early 2002, January 2002. But Dr. Phillips also noted that there was some reference in the record to the date November 30, 2001.
The patient history indicated that prior to this visit Ms. Marks had been seen by a Dr. Dale and had not gotten well. Dr. Phillips did not have any of Dr. Dale’s medical records, so they were not included in his review. The only medical information in Ms. Marks’ record for the interval between November 30, 2001 and Ms. Marks’ initial visit to Dr. Phillips’ associate on November 25, 2002 was a May 1, 2002 MRI.
11 (According to Dr. Phillips, the MRI showed a moderate degeneration at the lumbosacral spine. Looking at the MRI, Dr. Phillips determined that her arthritic condition was early but at Ms. Marks’ age, more than one would expect. He stated that Ms. Marks’ diagnosis after this first examination was lumbosacral arthritis and a cervical and lumbar sprain. He further stated that objective findings were an abnormal MRI and muscle spasm in the lumbar spine and Ms. Marks’ subjective complaints were pain in the neck and back, and limited motion in the neck and back. Ms. Marks’ next visit was on January 20, 2003. She was still complaining of neck and back pain and still having giving way of her knee, but there was less swelling in her knee. Objective symptoms during this visit were cervical and lumbar muscle spasm. Ms. Marks had appointments scheduled for May 15th and June 10th, but did not keep them.
*564 Dr. Phillips stated that after reviewing Ms. Marks’ records his prognosis for her was that she had an apparently chronic lumbar and cervical strain of moderate severity with some pre-existing arthritis in the lumbosacral spine and that it was aggravated by the trauma. He further stated that after reviewing Ms. Mark’s chart, given the history of her being asymptomatic prior to the accident and having continued complaints of pain for over a year following the accident, he believed that there was a reasonable medical probability that the auto accident caused the problem. On cross-examination, Dr. Phillips stated that his opinion was based upon Ms. Marks’ history that she had had no problems with her neck or back before the accident. He further stated that if, in fact, Ms. Marks had a history of neck and back pain that preceded this accident, his opinion would be affected.
As previously stated, the trial court found for defendants. In his well written reasons for judgment the trial court ultimately found that:
.... the photographs of the defendant’s vehicle, the confused testimony of the plaintiff at trial, the clear issue of preexisting injury, and the testimony of the defendant call into question both the In occurrence and the severity of this accident. In consideration of the foregoing facts, the court concludes that the plaintiff has not proven by a preponderance of the evidence that the defendant was a cause-in-fact of her injuries. Because the plaintiff has not successfully met this initial legal burden, the court need not proceed with the remainder of the duty/risk analysis.
In brief to this court plaintiffs assert that the trial court erred in its holding that the accident was not a cause in fact of plaintiffs’ injuries, and in failing to award damages for said injuries.
Pursuant to La. C.C. Art. 2315(A) “Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.” La. C.C. Art. 2316 further provides that “Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.”
In Simmons v. CTL Distribution, 03-1301 (La.App. 5 Cir.), 868 So.2d 918, ivrit denied, 04-0743, 04-0764 (La.5/14/04), 872 So.2d 524, the court stated:
In determining liability for negligence under La.C.C. art. 2315, the courts employ the duty/risk analysis, following a four-prong inquiry: (1) Was the conduct in question a substantial factor in bringing about the harm to the plaintiff. Namely, was it a cause-in-fact of the harm which occurred? (2) Did the defendants) owe a duty to the plaintiff? (3) Was the duty breached? (4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached? In order for a plaintiff to recover, all four inquiries must be affirmatively answered, (citations omitted)
id. 868 So.2d at 924
In Hill v. Abraham, 00-327 (La.App. 5 Cir. 9/26/00), 770 So.2d 824, 827, the court noted that:
The plaintiff in a personal injury action has the burden of proving by a preponderance of evidence that the injury complained of was caused by the accident giving rise to the suit. Further, it is the plaintiffs burden to demonstrate that the injuries were not caused by an intervening act. (citations omitted)
In Scramuzza v. River Oaks Inc., 03-959 (La.App. 5 Cir. 3/30/04), 871 So.2d 522, 529, unit denied, 04-1088 (La.6/25/04), 876 So.2d 839, the court noted that 112*‘[w]hether an action is the cause-in-fact *565 of the harm is essentially a factual determination that is usually left for the factfin-der.” A court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Tortorich v. Otis Elevator Co., Inc., 02-275 (La.App. 5 Cir. 10/16/02), 831 So.2d 307, 311.
Given the evidence presented at trial, including the confused and contradictory testimony of Ms. Marks and the medical evidence showing pre-existing injury, we find no “manifest error” in the trial court’s finding of facts. Accordingly, we affirm the judgment of the trial court and assess costs of this appeal to plaintiffs.

AFFIRMED.