868 So.2d 918 (2004)
Marlon SIMMONS, et al.
v.
CTL DISTRIBUTION and Darren Tomas.
No. 03-CA-1301.
Court of Appeal of Louisiana, Fifth Circuit.
February 23, 2004.
*920 James M. Dill, David B. Gooch, The Dill Firm, A.P.L.C., Lafayette, LA, for Appellant.
Walter C. Dumas, Patti Durio Hatch, Dumas and Associates, Baton Rouge, LA, Richard J. Arsenault, John Randall Whaley, Neblet, Beard & Arsenault, Alexandria, LA, for Appellee.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY and MARION F. EDWARDS.
*921 JAMES L. CANNELLA, Judge.
The Defendants, CTL Distribution, Inc. (CTL) and Darren Tomas (Tomas), appeal a judgment in a wrongful death and survival action in favor of the Plaintiffs, Marlon Simmons and his deceased mother, Dolores Simmons. We amend in part and affirm as amended.
On April 5, 2002, Tomas, a tractor trailer truck driver employed by CTL, was transporting molten sulfur on the River Road near Romeville, Louisiana. He lost control of the truck in an "S" curve and it overturned, spilling the sulfur. Eric Deroache, an employee of the St. James Parish Council charged with the responsibility of emergency response, ordered a mandatory evacuation of the residents in the Romeville community as a precautionary measure in the event of wind shifts or catastrophic failure of the tank containing the sulfur. Molten sulfur is a health hazard which can cause respiratory irritation. The evacuation was ordered at 7:20 a.m.
Dolores Simmons was a 62 year old retired teacher's aide and a life-long resident of Pleasant Hill Street, one of the streets subject to the evacuation. She lived there with two sisters, her nephew, Marlon Simmons, and his son, her grandson. As usual, Dolores Simmons was awake at 5:00 a.m. At 6:45 a.m. she woke her son and fixed breakfast. After breakfast, Marlon Simmons went outside to cut the grass. He noticed that there was no activity on the street, which was unusual. He told his mother and she telephoned another family member to find out what was going on in the neighborhood. When Marlon went back outside, he saw police officers, one of whom told them to evacuate the area and to go to Romeville School. His mother became extremely anxious and began shaking. Marlon made two trips to the school transporting the family. He first took his son, cousin and disabled aunt. On his second trip, he transported his mother and another aunt. When they arrived at the school, Dolores Simmons was having breathing problems and was trembling. The paramedics on the scene arranged for her to be transported to St. Elizabeth's hospital, where she was admitted with atrial fibrillation with a rapid ventricular rate, leading to severe pulmonary edema, and respiratory failure secondary to pulmonary edema. She was intubated at that time. She remained there for six days, but her condition deteriorated and she was transferred to Our Lady of the Lake Hospital in Baton Rouge, Louisiana on April 11, 2002. Dolores Simmons remained intubated and in respiratory failure. She died on May 2, 2002, approximately one month after the sulfur spill.
Marlon Simmons filed suit for his mother's wrongful death and for her survival damages on June 17, 2002. On March 12, 2003, a judge trial took place. On May 14, 2003, the trial judge found the Defendants liable and awarded survival damages on behalf of the deceased in the amount of $950,000, special damages for medical and funeral expenses of $134,575.05, and wrongful death damages in the amount of $300,000.
On appeal, the Defendants contend that the trial judge erred in finding that the stress of the evacuation was the legal cause of Dolores Simmons' death because she was not exposed to any sulphur from the spill and she had a long history of pulmonary and cardiac disease. The Defendants also contend that the survival and wrongful death damages are excessive.
The evidence at trial showed that it was unlikely that Dolores Simmons condition was caused by inhalation of sulfur fumes, because the sulfur cloud released by the accident was blown away from her residential area across the Mississippi River. The *922 evidence also shows that she had longstanding pulmonary and cardiac medical conditions and that she had been hospitalized and successfully treated on other occasions for congestive heart failure and pulmonary edema. The issue then, is whether the stress of the evacuation triggered an acute flare-up of those conditions, which ultimately led to her death. The trial judge found that it did, stating that "the direct cause of Dolores Simmons death was severe acute pulmonary edema and respiratory failure secondary to pulmonary edema which was prompted by her severe stress from the mandatory evacuation."
Dr. Anu Vellanki, a board certified internist, was Dolores Simmons' treating physician and was called when she was brought to the emergency room at St. Elizabeth Hospital. According to Dr. Vellanki, she was hospitalized three weeks before the incident for cellulitis, an inflammation of skin and underlying tissues, and leg swelling, unrelated to congestive heart failure and the resultant pulmonary problems. Shortly thereafter, he saw her in the office. He stated that at that time, her congestive heart failure was stable and that she did not exhibit shortness of breath, or have pulmonary edema.
Dr. Vellanki discussed her condition on April 5, 2002. He explained that Dolores Simmons' severe acute pulmonary edema (fluid in the lungs) was caused by rapid, irregular heart beat (atrial fibrillation) which prevents the heart from pumping blood fast enough through the lungs. Thus, fluid accumulates, depleting the oxygen levels in the lungs. This required her to have a tube inserted down her throat into the lungs to help her to breathe comfortably. Oxygen is pumped through the tube by a ventilator. Because she needed a ventilator to breathe, she was diagnosed with respiratory failure. Despite the physicians' efforts, the treatment was unsuccessful and she died in Our Lady of the Lake Hospital in May of 2002.
Dr. Vellanki stated that Dolores Simmons' did not suffer from shortness of breath daily, that, more likely than not, the severe stress from the evacuation triggered the rapid ventricular heart rate that led to shortness of breath and pulmonary edema as the fluid accumulated in the lungs, and to the resultant respiratory failure and death.
Dr. Albert Pearce, an expert in internal medicine and cardiology, explained the relationship between the heart and lungs, which are connected by the pulmonary artery and veins. Dr. Pearce noted that the primary purpose of the heart is to pump oxygenated blood to the body. Its secondary purpose is to deliver oxygen-depleted blood to the lungs to be re-infused with oxygen. Following that, the oxygenated blood is sent back to the heart for delivery to the rest of the body. In cardiogenic (heart related) pulmonary edema, fluid builds up in the lungs because of a heart problem, as in this case. Cardiogenic pulmonary edema can occur due to atrial fibrillation and/or rapid ventricular rate and can result in heart failure. Normally, the atrial does not contribute significantly to cardiac output, but when the muscle is diseased, the atrial contributes up to 20% of the cardiac output. When atrial fibrillation occurs, heart failure can follow because the atrial cannot contract with sufficient strength to fill the heart. Dr. Pearce noted that congestive heart failure can be systolic and/or diastolic. In systolic heart failure, the weakened ventricle muscle, located in the upper part or chamber of the heart, lacks the full ability to squeeze. In diastolic heart failure, the muscle works well, but is thickened and requires more pressure for the muscle pump to fill the heart properly. Intubation provides the *923 necessary oxygen. In non-cardiogenic pulmonary edema, the pulmonary fluid build-up is unrelated to heart problems. This is referred to as adult respiratory disease syndrome (ARDS).
In reviewing her history, Dr. Pearce noted that Dolores Simmons remained in respiratory failure from the day that she was admitted to the hospital until her death more than one month later. During her hospitalizations she was taken off the ventilator once, but she was unable to breathe on her own and the breathing tube had to be reinserted. Because she had been on the ventilator for some time and the larynx can be damaged with long-time use, a tracheostemy was performed. In that procedure, the breathing tube was inserted into Dolores Simmons' neck via an incision.
Dr. Pearce noted that Dolores Simmons had been hospitalized shortly before this incident with cellulitis. He agreed with Dr. Vellanki that the cellulitis was unrelated to atrial fibrillation, rapid ventricular rate, pulmonary edema or respiratory failure. He also testified that stress can aggravate hypertension and some heart conditions, noting that the literature includes a study showing that congestive heart failure was often preceded by an emotional event. He also noted that she was a long time smoker, which can cause chronic obstructive pulmonary disease, and that she did not always take her hypertension medications. However, he felt that her pulmonary edema episodes were transient and that the lower area of her heart was thickened, impairing her ability to get sufficient oxygen. Although, he agreed that smoking and her pre-disposition to congestive heart failure could have contributed to her inability to get off the ventilator, Dr. Pearce testified that it was more probable than not that the stress of the evacuation caused the series of medical events that led to her death.
Dr. Carl Lavie, an expert cardiologist, disagreed with Drs. Pearce and Vellanki. He testified that the stress of the evacuation was not the precipitating cause of Dolores Simmons' hospitalization following the evacuation, or of the conditions that led to her eventual death. He noted that she was morbidly obese, that she smoked for 40 years, and had heart/lung disease for 11 years. Dr. Lavie stated that the nurse's report of Dolores Simmons' hospitalization for cellulitis several weeks before the sulfur spill indicated that she was short of breath walking to the bathroom and, in his opinion, the leg swelling or cellulitis indicated that she was experiencing congestive heart failure at that time. He contended that her heart rate was no higher on the date of the accident than in her prior hospital admissions. Although he claimed that stress could have played a small part in raising her heart rate, her diastolic squeeze ability was severely impaired prior to the accident. He stated that her heart rate was brought under control within 1-2 days of hospitalization. Thus, had the heart caused the problems, the doctors should have been able to remove the breathing tube (extubate). He concluded that she could have had an infection or some other reason for the fluid retention unrelated to cardiac problems and that her death was probably caused by ARDS.

SCOPE OF REVIEW
On appellate review, the court's function is to determine whether the findings of the trier of fact were clearly wrong or manifestly erroneous. Matta v. Snow, 01-760, p. 7 (La.App. 5th Cir.1/15/02), 807 So.2d 934, 938; Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of *924 fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Matta, 01-760 at p. 7, 807 So.2d at 938; Rosell, 549 So.2d at 844. The issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether its conclusion was a reasonable one. Matta, 01-760 at p. 7, 807 So.2d at 938; Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La. 1993). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Matta, 01-760 at p. 8, 807 So.2d at 939; Stobart, 617 So.2d at 882. Only where the documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, may the court of appeal find manifest error, even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-845.

DUTY/RISK ANALYSIS
In determining liability for negligence under La.C.C. art. 2315, the courts employ the duty/risk analysis, following a four-prong inquiry: (1) Was the conduct in question a substantial factor in bringing about the harm to the plaintiff. Namely, was it a cause-in-fact of the harm which occurred? (2) Did the defendant(s) owe a duty to the plaintiff? (3) Was the duty breached? (4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached?" Davis v. Witt, 02-3102, pgs. 10-11 (La.7/2/03), 851 So.2d 1119, 1126-1127. In order for a plaintiff to recover, all four inquiries must be affirmatively answered. In order to do so, a plaintiff must prove five separate elements: (1) that the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) that the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) the actual damages (the damages element). Id.

DUTY AND BREACH OF THE DUTY
The issue of whether a defendant had a duty to a plaintiff is a question of law. That question is answered by determining whether a plaintiff has any law (statutory or jurisprudential) to support his claim. Roberts v. Benoit, 605 So.2d 1032, 1043 (La.1991), on rehearing.
Clearly, in this case, the Defendants had a duty to the public that might be affected by the spilling of hazardous material in their neighborhoods. That duty was breached by the driver's failure to execute an "S" curve on the River Road resulting in the chemical spill that mandated the evacuation.

SCOPE OF THE DUTY OR LEGAL CAUSE
There is no "rule" for determining the scope of the duty, whether stated in terms of proximate cause, legal cause, or duty. Roberts, 605 So.2d at 1044. The scope of the duty inquiry is a policy question as to whether the particular risk falls within the scope of the duty. Id. In Roberts, the Court stated:
Generally, the scope of protection inquiry becomes significant in "fact-sensitive" cases in which a limitation of the "but for" consequences of the defendant's substandard conduct is warranted. These cases require logic, reasoning and policy decisions be employed to determine *925 whether liability should be imposed under the particular factual circumstances presented....
In determining the limitation to be placed on liability for a defendant's substandard conducti.e., whether there is a duty-risk relationshipwe have found the proper inquiry to be how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced.... Although ease of association encompasses the idea of foreseeability, it is not based on foreseeability alone." Absent an ease of association between the duty breached and the damages sustained, we have found legal fault lacking.
Roberts, 605 So.2d at 1045. [Citations omitted]
It is clear that the release of molten sulfur into a neighborhood could cause respiratory problems to the populace. That did not occur in this case. However, it is also reasonable to expect those affected to be anxious and nervous about the potential harm to them. This would be especially stressful for a person with medical conditions in general and respiratory problems in particular. Based on the testimony of Drs. Pearce and Vellanki, stress can and did raise Dolores Simmons' heart rate and can and did lead to atrial fibrillation and ventricular rapid heart rate. Thus, there is an ease of association between the evacuation caused by the accident, and to the harm here. In addition, her physical response was foreseeable given her medical history. We find therefore, that the Plaintiff proved legal causation as the harm was within the scope of the duty breached by the Defendants.

CAUSE-IN-FACT
A plaintiff in a personal injury lawsuit must prove causation by a preponderance of the evidence. Dabog v. Deris, 625 So.2d 492, 493 (La.1993). The cause-in-fact question is generally a "but for" inquiry. If the Plaintiff probably would have not sustained the injuries but for the Defendant's substandard conduct, such conduct is a cause in fact. Roberts, 605 So.2d at 1042. "Stated differently, the inquiry is `[d]id the defendant contribute to the plaintiff's harm or is the defendant a cause of the plaintiff's harm?'" Crowe, The Anatomy of a Tort-Greenian, as Interpreted by Crowe who has been Influenced by MaloneA Primer, 22 Loy. L.Rev. 903, 920 (1976); Roberts, 605 So.2d at 1042. If multiple causes exist, the courts use an alternative method, the "substantial factor" test for determining cause in fact. Roberts, 605 So.2d at 1042. Under this test, cause in fact exists when a defendant's conduct was a "substantial factor" in bringing about a plaintiff's harm. Id., Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). The Roberts Court stated that in determining cause-in-fact under either method, it is irrelevant whether the defendant's actions were "lawful, unlawful, intentional, unintentional, negligent or non-negligent," citing Green, The Causal Relation Issue in Negligence Law, 60 Mich.L.Rev. 543, 549 (1962); Roberts, 605 So.2d at 1042. "Rather, the cause in fact inquiry is a neutral one, free of the entanglements of policy considerationsmorality, culpability or responsibilityinvolved in the duty-risk analysis." Id. To the extent that a defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. Roberts, 605 So.2d at 1042.
In addition, it is axiomatic that a tortfeasor takes his victim as he finds her. Lasha v. Olin, 625 So.2d 1002, 1006 (La.1993). A defendant's liability for damages is not mitigated by the fact that the plaintiff's pre-existing physical infirmity is *926 responsible in part for the consequences of the plaintiff's injury. Id.
Two physicians in this case testified that the extreme stress of the evacuation caused Dolores Simmons's rapid, chaotic heartbeat that lead to pulmonary edema and respiratory failure. Their conclusion was disputed by Dr. Lavie. All of the doctors were eminently qualified in their fields and all had access to Dolores Simmons' medical history. Since neither the documents nor objective evidence so contradicted their testimony, nor was the testimony so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, the trial judge's determination of credibility cannot be disturbed. Furthermore, the Defendants cannot avoid liability because of Dolores Simmons' medical history. They must take her as they found her. Thus, we find no manifest error in the finding that the accident and evacuation caused Dolores Simmons's death.

DAMAGES
The standard for the review of damage awards is whether, after an articulated analysis of the facts, the appellate court finds that the trial judge abused his great discretion. Farrell v. Pierre, 02-1136, p. 9 (La.App. 5th Cir.4/8/03), 846 So.2d 49, 55; Matta, 01-760 at p. 8, 807 So.2d at 939; Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). This determination is made with consideration to the individual circumstances of an injured plaintiff. Farrell, 02-1136 at p. 9, 846 So.2d at 55; Matta, 01-760 at p. 9, 807 So.2d at 939; Theriot, 625 So.2d at 1340. After an analysis of the facts and circumstances peculiar to the particular case and a particular plaintiff, an appellate court may conclude that the award is inadequate (or excessive). Farrell, 02-1136 at p. 9, 846 So.2d at 55; Matta, 01-760 at p. 9, 807 So.2d at 939; Theriot, 625 So.2d at 1340. Only then does the appellate court resort to prior awards, and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Farrell, 02-1136 at p. 9, 846 So.2d at 55; Matta, 01-760 at p. 9, 807 So.2d at 939; Theriot, 625 So.2d at 1340.

SURVIVAL DAMAGES
The Defendants contend that the survival award is excessively high considering that Dolores Simmons did not exhibit conscious pain and suffering during the month prior to her death. The only evidence at trial on this issue was the medical records. In both doctors' and nurses notes, it is reported that she appeared comfortable on the ventilator, that she exhibited no signs of distress, and that she was sitting up in bed watching television or resting quietly. The respiratory therapists that treated her also noted that her respirations were regular and unlabored, her breath was clear, free of cough, her nasal drainage/sputum was clear and her nails and mucous membranes were pink. The Defendants assert that these signs indicate that she was getting adequate oxygen and had good blood circulation. During her stay, she was not confined to her bed and could move to a chair or wheelchair. Furthermore, the nurses' notes at Our Lady of the Lake Hospital consistently report a pain level of "0." Citing various cases, the Defendants contend that the highest award that could be awarded for her pain and suffering is $50,000.
The Plaintiff argues that Dolores Simmons spent the last month of her life conscious, but trapped in a hospital bed, intubated and completely unable to speak or to fully convey her thoughts and feelings to her son, family and friends who visited her every day. As the days went on, her breathing became more labored, *927 until she took her last breath. In his reasons for judgment, the trial judge stated that "The life which Dolores Simmons led after the onset of the severe acute pulmonary edema was one of suffering and pain." He stated that being "comfortable" in a hospital is not the same as being comfortable when one is healthy, and that being intubated and having trouble breathing is unquestionably painful. He recognized that she had to endure all of this for over a month.
In photographs admitted into evidence while she was in the hospital, it is apparent that the trial judge is correct that being comfortable in a hospital is a relative term. Dolores Simmons had several needles and tubes connecting her to various machines. She could not speak and had a writing board with paper on her lap for communication. Furthermore, Marlon Simmons testified that, while waiting to be admitted on April 5, 2002, she told him that she did not think she was going to make it this time. Thus, for a month, she feared her death. Unfortunately, because she was never taken off the breathing tube, those were the last words that she spoke to her son.
While we do not doubt that Dolores Simmons' experiences in the hospital were painful, unpleasant and fear producing, we find that the award for Dolores Simmons' pain and suffering is excessively high given the particular facts and circumstances of this case. After reviewing the case law, we found no cases that are sufficiently similar to guide us in determining the highest amount that is reasonably within the trial judge's discretion. Nevertheless, we find that the highest amount that could reasonably be awarded for Dolores Simmons' pain and suffering is $450,000 and will amend and reduce the survival award to that amount.

WRONGFUL DEATH DAMAGES
The elements of damage for a wrongful death action are loss of love, affection, companionship, services, support, medical expenses and funeral expenses. See, Bujol v. Entergy Services, Inc., 00-1621, p. 46 (La.App. 1st Cir.8/14/02), 833 So.2d 947, 983 and Clark v. G.B. Cooley Service, 35,675, p. 9 (La.App. 2nd Cir.4/5/02), 813 So.2d 1273, 1280. "Attempts to measure in money such intangibles as grief, loss of love and affection, and loss of companionship are subjective and discretionary...." Comberrel v. Basford, 550 So.2d 1356, 1362 (La.App. 5th Cir. 1989), writs denied, 556 So.2d 1284, 1285, 1286 (La.1990); Bujol, 00-1621 at 46, 833 So.2d at 983.
The Defendants claim that an award of $300,000 to Marlon Simmons for the wrongful death of his mother is excessively high. They assert that, although he described a close and loving relationship with his mother and claimed he lived with her his entire life except for six months, he was unaware of her prior hospitalizations, and knew only about her high blood pressure and "a problem with her sugar." The Defendants note that when she filled out the admission forms to the various hospitals, she never put his name down as the person to contact. In addition, the Occupational Therapy Evaluation made at Our Lady of the Lake Hospital on the day before she died reflects that she "lives alone." The Defendants also argue that Dolores Simmons lived past her life expectancy and had medical problems. According to the medical experts, she could have died at any time. The Defendants assert that given these facts, the highest award that is appropriate for her wrongful death is $125,000.
Marlon Simmons' testified that he had a close and loving relationship with his mother. He stated that he lived with her *928 his entire life except for six months he was married. She fixed the family breakfast every morning and he took her shopping and to her medical appointments. Marlon Simmons was vague about his mother's medical conditions, but spent all of his free time in the hospital with her during her last days. During his testimony he was emotionally overcome when he spoke about her. Furthermore, Marlon Simmons' son was also living with the family and being cared for by Dolores Simmons while he worked. After her death, Marlon had to send the child to live with the child's mother in New Orleans because he had no one to care for the child while he was working. Under these facts, we find that the award for wrongful death was not an abuse of the trial judge's great discretion.
Accordingly, we hereby amend and reduce the survival damages to $450,000. We affirm the judgment in all other respects, as amended. Costs of this appeal are assessed against the Defendants.
AMENDED IN PART AND AFFIRMED AS AMENDED.