905 So.2d 415 (2005)
Cynthia LeBLANC
v.
Thomas BAXTER, State Farm Mutual Automobile Insurance Company.
No. 05-CA-33.
Court of Appeal of Louisiana, Fifth Circuit.
May 31, 2005.
*417 Salvador M. Brocato, III, Metairie, Louisiana, for Plaintiff/Appellee.
Richard L. Olivier, Connick and Connick, L.L.C., Metairie, Louisiana, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY, and WALTER J. ROTHSCHILD.
JAMES L. CANNELLA, Judge.
Defendant, the Parish of Jefferson (the Parish), appeals from a judgment in an automobile accident case in favor of the Plaintiff, Cynthia LeBlanc. We affirm and remand.
On July 21, 2000, at approximately 3:15 p.m., the Plaintiff's Ford cargo van was struck by a Chevrolet Blazer driven by Thomas Baxter, III (Baxter) as she crossed the intersection of Derbigny Street and Fourth Street (La.18) in Gretna, Louisiana. The Plaintiff was driving North on Derbigny toward the Mississippi River, while Baxter was traveling East on Fourth Street. Baxter was in the course and scope of his employment with the Parish as the Supervisor of Code Enforcement. In the collision, Baxter's car hit the van on the left rear, flipping it onto its side. The Plaintiff was taken to the West Jefferson Medical Center emergency room for injuries to her neck, chest, and back, a fractured shoulder, concussion, multiple bruises, and contusions.
On December 11, 2000, the Plaintiff filed a petition for damages against Baxter, and his insurer, State Farm Mutual Automobile Insurance Company (State Farm). She later added Clarendon American Insurance Co., her uninsured/underinsured carrier, and the Parish. The claims against Baxter personally, State Farm, and Clarendon were dismissed in 2003. The claim against the Parish was tried by a judge on June 14 and June 16, 2004. Judgment was rendered in favor of the Plaintiff on September 28, 2004, awarding the Plaintiff $215,000 in general damages, $18,930.50 in special damages and costs.
On appeal, the Parish contends that the trial judge erred in qualifying Wayne Winkler (Winkler) as the Plaintiff's expert on fault, in basing her finding of liability on the deposition testimony of Michael Timmons (Timmons), and in finding the *418 Parish liable. The Parish further contends that the trial judge erred in awarding future medical benefits to the Plaintiff, in failing to order the establishment of a reversionary trust for future medicals, in awarding $215,000 in general damages, in ordering the Parish to pay court costs without specifying the amount, and in failing to consider the Parish's post-trial memorandum.

EXPERT TESTIMONY
The Parish challenges the qualification of Winkler as an expert in accident reconstruction and accident investigation. It asserts that the trial judge erred in attempting to qualify Winkler before defense counsel cross-examined him on his qualifications. The Parish further argues that the trial judge erred in allowing the Plaintiff to rehabilitate Winkler. The Parish contends that there was no testimony showing Winkler was qualified or that the underlying reasoning or methodology employed by him was valid and could be properly applied to the facts herein, and notes that Winkler was found unqualified by a court in the 19th Judicial District. It also contends that Winkler does not possess a college degree, and that Winkler's testimony as to speed is not relevant because both parties claimed to have the green light and the right of way. In addition, the Parish contends that if Winkler is qualified, his conclusions were speculative and mere conjecture because they were based on inaccurate and incomplete information and required the arbitrary assignment of a reaction time, drag co-efficient, speed of the vehicles and length and starting point of Baxter's skid marks.
Admissibility of expert testimony in Louisiana is governed by La.C.E. art. 702, which provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of act to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
A district court is accorded broad discretion in determining whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert. Cheairs v. State ex rel. Department of Transp. and Development, 03-0680 (La.12/3/03), 861 So.2d 536, 541.
In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-594, 113 S.Ct. 2786, 2796-2797, 125 L.Ed.2d 469 (1993), the United States Supreme Court set forth the following factors to be considered in determining the reliability and, therefore admissibility, of expert testimony: 1) whether the theory or technique has been subjected to peer review and/or publication, 2) the known or potential rate of error, 3) the testability of the theory or technique, and 4) whether the methodology is generally accepted in the scientific community. This standard was subsequently adopted by the Louisiana Supreme Court in State v. Foret, 93-246 (La.11/30/93), 628 So.2d 1116, as a guide to determining the admissibility of expert testimony under La.C.E. art. 702. The Daubert factors are designed to "assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue." Daubert, 509 U.S. at 592-593, 113 S.Ct. at 2796; State v. Chauvin, 02-1188, p. 5 (La.5/20/03), 846 So.2d 697, 701.
In Cheairs, 03-0680 at 8, 861 So.2d at 541-542, the Louisiana Supreme Court recognized a distinction between challenging the reliability of the methodology used by the expert, which is addressed by a Daubert inquiry, and the qualifications of *419 the expert to testify competently regarding the matters he intends to address. See: State v. Torregano, 03-1335 (La.App. 5th Cir.5/11/004), 875 So.2d 842, at 850 fnt. 7. The Court stated that the "above principles should not, however, be interpreted to mean that a court should not consider an expert's qualifications when deciding whether to admit a particular expert's testimony, only that the Daubert case does not directly address that issue." Cheairs, 03-0680 at 8, 861 So.2d at 542 [emphasis added.]
Experience alone is normally sufficient to qualify a witness as an expert. Cheairs, 03-0680 at 8, 861 So.2d at 542; Manchack v. Willamette Industries, Inc., 24,599 (La.App. 2nd Cir.8/12/93), 621 So.2d 649, 653. Generally, the fact that a witness does not have a college degree does not disqualify him from testifying as an expert, as long as the witness has sufficient experience in the area. Cheairs, 03-0680 at 8, 861 So.2d at 542; Manchack, 621 So.2d at 653.
Winkler's qualifications as an expert in accident reconstruction and his methodology were thoroughly examined at trial. He spent 15 years with the Louisiana State Police (LSP), mostly with Control Operations at Troop B in New Orleans, and attended courses in training and investigation at the Louisiana State Police Academy. After several years he attended an Advanced Technical Accident Investigation course, which built on both the basic courses from the academy and his on-the-job experience. He attended the Northwestern University (Northwestern) Traffic Institute's Technical Accident Reconstruction five-part series of courses on traffic accident reconstruction. Northwestern's Traffic Institute is considered the premiere agency in teaching this subject and was initially designed to assist law enforcement in the investigation of traffic accidents. Those courses included the application of physics and mathematics specifically geared toward accident reconstruction. The courses were taught in Baton Rouge at the LSP academy and ranged from one to two weeks in length. The students were taught vehicle dynamics by using physics formulas, trigonometry, metric geometry and algebraic formulas that would be used in accident reconstruction. In a two week course, he was taught the theories and protocols for accident reconstruction, including mechanics, and conservation of momentum and energy. The students also studied several case presentations. The last course in the series built upon those principals and dealt with motorcycles, trigonometry, occupant motion, pedestrian accidents, the mathematical solution for conservation of momentum, and additional case studies.
Winkler spent the next five years working with LSP. Over the course of his employment, he also took other courses, some of which were continuing education. Although he does not have a college degree, he noted that engineers with degrees would also have to take these courses to become qualified in accident reconstruction. His curriculum vitae showed the professional development courses that he attended related to accident reconstruction. He noted that, although all LSP investigate accidents, not all have the opportunity to attend the advanced courses. He noted that LSP mainly handle traffic accident investigations and traffic law enforcement, although they do get involved in other criminal investigations.
In 1995, Winkler was promoted and became Assistant Shift Supervisor, which included responsibility for reviewing serious injury and fatality accidents for all shifts. His daily duties included reviewing accident reports, including reports of serious *420 injury cases and fatalities. He offered technical assistance to troopers conducting the investigations and reviewed their reports which were gathered for possible criminal prosecutions. He was also on a committee to improve the methods for investigating serious injury and fatal accidents. During his career, he investigated more than 3,000 accidents and had testified in court in several parishes as an expert in accident reconstruction. He denied ever being disqualified, but discovered on cross-examination that he had apparently been disqualified in one case pursuant to a motion in limine. He had not been informed of this fact and was disqualified without a hearing on his qualifications. Winkler has not published any papers on the subject, but testified that his calculations are made from simple mathematical and physics formulas and the known rate of error is the same as applicable to any high school or college mathematics course.
Winkler testified that he based his opinion of the signal light's color when the accident happened on his experience and his calculations made with the formulas learned in his training and experience. He gave the margin of error for his opinion on the drag co-efficient as ranging from .6 to.7, using a fixed number of the skid marks and the investigating officer's deposition. In reaching his conclusions, he used a formula involving the coefficient of friction and the deceleration rate of the vehicle on that particular roadway, the distance of the skid marks, and an estimation of Baxter's speed related to the amount of damage, or crush deformity, on the front of his vehicle. He determined speed, time/distances, and used reaction time. In order to reach those "end facts," he applied formulas and equations taught in basic high school mathematics and in the Northwestern courses. Winkler testified that these are standard formulas used by all experts in the field. In calculating those factors, he included the margin of error by designating a range, or the minimum. Winkler had calculated speed in approximately four of the eight cases in which he had been qualified as an expert.
Based on the record, we find that the Daubert issue as to methodology and Winkler's qualifications were completely and thoroughly addressed. The trial judge was not mandated to follow a decision by the one judicial district court that disqualified Winkler. Other courts have qualified the witness, who is by experience and education well qualified to testify as an expert in accident reconstruction.
The Parish also contends that the information used by Winkler to reach his conclusions that Baxter's light was red was faulty and thus, his conclusions were faulty. Winkler first testified only that something other than the van crossed Baxter's path causing him to brake hard enough to lay down skid marks. The Parish questioned Winkler extensively on this issue during cross-examination, eliciting Winkler's opinion that Baxter's light was red. These are factual issues that go to the merits of the case, and are not relevant to the qualification of Winkler as an expert in accident reconstruction. Thus, we find that the trial judge did not abuse his discretion in qualifying Winkler as an accident reconstruction expert.

LIABILITY
The Parish argues that the trial judge erred in finding liability based on the self-serving testimony of the "litigious" Plaintiff and her "purported" witness, Timmons, who failed to appear at trial, over that of the testimony of two independent eyewitnesses and a settling co-defendant that had no interest in the outcome of the trial. The Parish argues that Timmons contradicts himself in his deposition, contradicts the Plaintiff's testimony, and is *421 implausible and not credible. It argues that Timmons is a convicted felon who has twice been convicted of driving while intoxicated (DWI), was on his way to the courthouse to pay his fine for a DWI at the time of the accident, and continues to drive despite a suspended license.
The Plaintiff admitted to a lawsuit from an accident in 1991 and there is no evidence of multiple lawsuits in her medical history or in the testimony. Plaintiff is the owner of a courier company and was on her way to file papers at the courthouse for a client at approximately 3:15 p.m. on the day of the accident. She was familiar with the area. Since the clerk's office closed at 4:30 p.m., she was not rushing. She had another delivery to make afterward, but that facility was open until 6:00 p.m. She remembered traveling at 25 miles per hour (m.p.h.), the speed limit, because a policeman with radar on Derbigny was checking the speed of passing vehicles that afternoon. Two blocks from Fourth she noticed that the light at the intersection was red. The Plaintiff started slowing. She was almost stopped when the light changed to green. The Plaintiff continued moving at the slow speed. She looked left to right when she arrived at the intersection, but did not see any cars coming toward her on Fourth from either direction. Feeling confident, she proceeded into the intersection and was almost out of the first lane, close to a set of railroad tracks running along Fourth, when Baxter's car struck her on the rear drivers' side. The Plaintiff stated that she lost consciousness in the collision and woke up lying pinned in the van on the passenger side. The Plaintiff was sure that the light was green when she entered the intersection.
Timmons' deposition was admitted into evidence by agreement of the parties when he failed to comply with a trial subpoena. He testified that he was on his way to pay a fine for DWI at the time of the accident. He was stopped at Derbigny and Fourth waiting for the red light to turn green before crossing when the accident happened. He noticed the Plaintiff's van on his left side stopped at the intersection. Timmons waited approximately 30 seconds before the red light changed to green. The van started to move. He waited a second or two before starting because, as the van crossed the first lane of travel, it blocked his view of the traffic from the left. Before he had a chance to start across, he heard squealing brakes and saw Baxter's Blazer strike the rear of the Plaintiff's van. When he heard the tire noises, the Blazer was very close, but not in the intersection. He went immediately to the van to the back window to see if he could help the Plaintiff. The van was locked and he could not see through the tinted windows. When he saw others rushing to the van with cell phones, he left because he was going to be late to pay his fine and he had no medical experience. When he was finished at court he returned to the scene, saw the police and identified himself as a witness. Timmons was sure that the light was green when the van entered the intersection because he was waiting for the light to change from red to green so he could cross the street. Because he was focused on the light and the van, he did not notice any cars behind Baxter or stopped in the lane across from him. He admitted that he had two prior convictions for DWI and was driving with a suspended license at the time.
Baxter testified that he had the green light. He testified that, just prior to the accident, he had been stopped for a red light at Fourth and Dolhonde. When the light turned green, he accelerated, but proceeded slowly toward Derbigny because the light was red at the intersection. He did not know if it was red when he was stopped at Dolhonde. Nevertheless, he *422 said that halfway there, the Derbigny intersection light also turned green. He then sped up to go through the intersection, noticed a white "flash" in his right peripheral vision, and hit his brakes before colliding with the object. He said that by the time he saw the flash, it was too late to stop or avoid the collision. He did not notice any cars stopped in the opposite lane on Fourth at Derbigny.
Baxter testified that as he traveled East on Fourth toward Derbigny, the office building on the right at the corner of that intersection obscured his view of the traffic traveling on Derbigny Street toward the intersection. He said that cars on Derbigny are not visible until they get into the intersection. When he saw the Plaintiff's car, he had very little time to react. He guessed that it was one second from the time he saw the Plaintiff until he hit his brakes. Baxter agreed that the van was approximately 15 feet in length, that he struck it on the rear drivers' side and that his car was damaged on the left front side. He could not tell how fast the Plaintiff was moving, but thought it was fast. The collision was severe. Baxter estimated his speed at between 20-25 m.p.h. when he struck the Plaintiff, because, when he left the light at Dolhonde, the light was red at Derbigny, and there was no point in going faster. He denied telling the investigating officer that he had been traveling 30 m.p.h. He could not disagree with the investigating officer's conclusion that the front of the van was in the westbound or opposite lane when he collided with it.
Baxter stated that Charlotte January showed up some time after the accident, after dropping her husband off at work, to tell him that she was a witness and had been behind him. He was unable to confirm that there were any cars behind him when the accident occurred. He also said that there were cars traveling on Fourth in the opposite direction, but was not sure how far from the intersection the cars were when the accident happened. He could not recall any cars stopped at the Fourth and Derbigny intersection at the time. The only other eyewitness he was aware of at the time was the pedestrian, Timmons.
While at the accident scene, the owner of a car body repair shop, Rick Combel (Combel), appeared and gave him his business card. Baxter knew him through his son-in-law and was going to send his car there anyway. One and ½ years later, he met Phillip Gattuso (Gattuso), at the car body repair shop. This was 1½ years before trial and before his settlement. Baxter was there for some minor repairs. Gattuso approached him when he recognized Baxter's car as being in the accident. He told Baxter that he was a witness and could testify that Baxter's light was green. Baxter gave Gattuso's name to the State Farm attorney representing him. Later, after he settled with the Plaintiff, he was at Combel's when he and Gattuso met for the second time and Baxter found out that State Farm's attorney had not contacted Gattuso.
Gattuso testified that when the collision occurred, the light at the intersection for Fourth was green. He said that he was stopped at the red light at the Fourth and Derbigny intersection in the lane opposite to Baxter. Gattuso is familiar with the area. He described a steep incline located several feet from the point that Derbigny meets Fourth as a "launching pad" for cars moving fast over it. The hump is approximately 2-3 feet from its lowest to highest point. Although he said that the Plaintiff was traveling fast when she entered the intersection, he did not see the Plaintiff's van leave the ground before impact, and he could not estimate her speed. Gattuso did not recall anyone stopped in Baxter's lane, *423 nor did he see Baxter's car driving toward him. He said that he noticed the Plaintiff's van coming from his left side prior to the light changing red for the Plaintiff. He noticed Baxter's car traveling slow right before the impact.
Contrary to the physical evidence, Gattuso insisted that that the passenger side fender and bumper of Baxter's car struck the van's driver's side front fender and bumper, and that the Plaintiff's vehicle struck Baxter. He disputed the police report and other witnesses. He also said that he neither heard tires squealing, nor saw Baxter's car sliding into the van. Gattuso also claimed that as the van turned over, it rotated and passed in front of his stopped vehicle before landing on its side. After the impact, Gattuso got out of his car and went to the Plaintiff. He saw her through the front windshield. She was not moving. He then decided to leave the scene to go get his friend Combel at his car body repair shop located nearby. He left the scene without talking to the police or Baxter because he wanted Combel to get the business to repair Baxter's car. He brought Combel back to the accident scene. Combel recognized Baxter, whom he had previously met. Gattuso walked up to Baxter with Combel, but neither Gattuso nor Combel told Baxter or the investigating police officer, then or later, that Gattuso was an eyewitness. Gattuso said that he did not volunteer the information because Baxter told Combel that he had 3 eyewitnesses to the accident that would state that Baxter's light was green. Gattuso said that he did not know Baxter at the time of the accident and met him for the first time in the fall of 2003 at the car repair body shop. At that time, he found out that liability was disputed.
Charlotte January (January), testified that the Plaintiff ran the red light at Derbigny. She stated that she was directly behind Baxter at the red light at the intersection at Dolhonde and Fourth. She said that the lights at the two intersections change at different times. Her trial testimony as to the color of Baxter's car changed from her deposition to her testimony at trial, but basically she was not sure. Her testimony varied also as to where Baxter struck the Plaintiff's van. January claimed that when she and Baxter left the Dolhonde intersection, the light at Derbigny was red. January claimed that Baxter slowed down as he neared the Derbigny intersection. When the light turned green, Baxter moved into the intersection at the same time as the Plaintiff. January stated that Baxter would not have seen her coming because of the building blocking his view at that spot. She did not believe Baxter locked his brakes and slid into the van, despite police photographs showing skid marks. January believed that the van flipped because the Plaintiff was traveling too fast over the steep incline on Derbigny. January thought that the Plaintiff was trying to beat the red light. In her deposition testimony she contended that Baxter's car was not damaged, which was contrary to the physical evidence. At trial, she said that she was not focused on his car after she saw the van flip on its side.
Winkler testified that the accident could not have occurred the way Baxter and his witnesses claimed. He was retained in April of 2003 and was provided with the police report, photographs taken at the time of the accident by the police, and a traffic signal light survey by the Department of Transportation and Development (DOTD). He also reviewed the depositions of the Plaintiff, Baxter, Timmons, January, Gattuso, and Officer Ronald Savage, the investigating officer. In addition, he was provided with two investigative reports, one by Bottom Line Investigations and one by Southern Regional Investigations. *424 Winkler visited the location in April of 2003 and August of 2003. In April of 2003, he made a sketch of the measurements of the road width, the relationship of the two roadways to each other, and the relationship of the building located at the southwest corner of the intersection. In August of 2003, he conducted a signal light survey and took some photographs.
Using standard formulas, Winkler determined Baxter's perception/reaction time, which is the point at which an object comes into the driver's field of view to the point at which that driver inputs whatever course of action he/she determines is best, based on the circumstances and/or hazard. Here, Baxter's reaction time would have started when he first observed something that required him to make a decision, continued through the time it took for him to remove his foot from the accelerator and apply the brakes, and ended at the point at which the tires locked, causing the car to skid, leaving marks on the roadway. The police report showed 17 feet of skid marks prior to impact. Winkler noted that the investigating officer's narrative said 30 feet, but that calculation included skid marks made during and after the impact. According to Winkler, the point Baxter began the reaction period would have occurred 70 feet from the impact. He used the accepted standard in the accident reconstruction industry for the minimum average reaction time of 1.5 seconds, which, in Winkler's experience is conservative because the time is usually greater due to environmental distractions. Thus, Baxter's actual reaction time could have been longer. Winkler then inputted a speed of 25 m.p.h. for Baxter, noting that Baxter's speed could also have been higher, as reflected in the police report, which states that Baxter told the investigating officer that he was traveling 30 m.p.h. in a 25 m.p.h. speed zone. At 30 m.p.h., the point of perception would have been 90 feet back from the impact. Winkler also noted that the investigating police officer marked the beginning of the skid marks at the stop bar, or white perpendicular line painted on the roadway, whereas Winkler gave Baxter the benefit of the doubt and placed the skid marks further back from the line. He took a photo at the point 70 feet from the impact point to show what was in Baxter's field of vision. He did the same analysis for the Plaintiff's vehicle, concluding that her vehicle was 60 feet from point of impact at the point of perception.
Based on the relationship of the office building to the beginning of the skid marks and the other calculations, Winkler disputed Baxter's claim that Baxter locked his brakes in reaction to the Plaintiff's van crossing the intersection. Considering Baxter's point of perception/reaction and the skid marks, and the location of the building at the corner of the intersection, neither Baxter nor the Plaintiff could see each other as they proceeded into the intersection.
At trial, Winkler was asked to calculate the distance of the point of perception using a one second, rather than one and a half second reaction time at speeds of both 30 and 25 m.p.h. for Baxter and 20-25 m.p.h. for the Plaintiff. He concluded that, at the low end speed, it is possible that Baxter could have seen the Plaintiff's van, but not at the higher speeds. At the lower speeds using one and a quarter seconds, it would have been unlikely, but possible, if he were looking in her direction and the front of the van were positioned closer to the signal light.
Winkler also testified to the color change sequence pattern for the signal lights in the area. In his visit to the scene in August of 2003, he observed the signal light sequence for 45 minutes to one hour at three intersections: Fourth and *425 Wyer (one block East of Derbigny), Fourth and Derbigny, and Fourth and Dolhonde (one block West of Derbigny). Winkler observed that the signals change in a specific order, which is consistent with the way all signal lights operate. The light at the intersection of Fourth and Wyer changes first, followed by the light at Fourth and Derbigny, followed in turn by the light at Fourth and Dolhonde. Thus, when the three lights change from the red signal, the Wyer light turns green first. One to two seconds later the lights at Derbigny turn green. One to two seconds after that, the light at Dolhonde changes to green. That is a standard sequencing system and is designed to allow heavy traffic on Fourth to move first at Wyer, to prevent the traffic at the intersections of Fourth and Derbigny and Fourth and Dolhonde from stacking up on the traffic waiting at the traffic signal at Wyer. Winkler reviewed the DOTD's Traffic Light Survey showing that this sequence had been the same since 1983, and that there had been nothing done since then, requiring the DOTD to change the pattern. Winkler testified that the DOTD does not change light sequences unless there is some major work being done, or without giving advance warning to drivers who become accustomed to the way a traffic signal operates. In addition, according to the accident report and the investigating officer's testimony, the officer checked the signal lights after the accident and indicated that they were not malfunctioning.
Because of the signal lights sequence pattern, Winkler disputed Baxter's and January's claims that the light at Derbigny was still red when the light at Dolhonde turned green, and that the light at Derbigny turned green at Derbigny as Baxter approached. That scenario is inconsistent with the physical evidence of the actual traffic signal sequencing pattern.
Winkler disputed Gattuso's claim that he was stopped in the opposite lane from Baxter because it is inconsistent with the physical evidence. If Gattuso had been stopped where he claimed, it is highly likely that his car would have been struck by the van, considering how far back the van was hit and how the right end rotated to the right as the van slid across the roadway. Winkler noted that the Plaintiff's van traveled 50 feet after impact. He explained that the van flipped over because the impact to the rear caused the right end to rotate around the center of the van. He noted that this is common with this type of vehicle when struck in this manner. The rotation factor caused the top of the van to end up perpendicular to its original path. Winkler also testified that, in an accident of this magnitude, he found it strange that Gattuso did not immediately go to the investigating officer to tell him that he was an eyewitness, but waited until 3 years later.
Winkler also disputed the testimony of January and Gattuso that Baxter was traveling very slowly prior to the impact, and that his car did not skid. The physical evidence of the car damage and skid marks show otherwise.
Winkler testified that Timmons' version is consistent with the skid marks, the location of the van after the impact, and the damage to Baxter's car. Winkler stated that all of the witnesses should have heard the tires squealing. Furthermore, he believed that Timmons' testimony, that the light was green for the Plaintiff when she crossed the intersection, is credible, because Timmons had to ensure his own safety before walking into the traffic lanes.
Winkler acknowledged that the police officer wrote in his report that it was obvious that Baxter observed the Plaintiff's van cross his path. However, Winkler *426 said this was a common error made by those without advanced training because they erroneously consider the point of perception to be where the skid marks start, rather than from where the hazard is first noticed and the reaction begins. He also disputed Baxter's claim that he saw a white flash pass him that caused him to brake, because, based on the physical evidence, the Plaintiff would have made it though the intersection safely had that happened.
Winkler further stated that the damage sustained by the Baxter car was consistent with his conclusions, along with Baxter's testimony that there was nothing in front of him to obscure his vision or distract him. Winkler concluded that the only reasonable explanation for Baxter's braking hard enough to lock his brakes was that the light at Derbigny changed from green to red, not red to green. Winkler concluded that Baxter was at fault in the accident.
On appellate review, the court's function is to determine whether the findings of the trier-of-fact were clearly wrong or manifestly erroneous. Himel v. State ex rel. Dept. of Transp. and Development, 04-274, p. 8 (La.App. 5th Cir.1/12/04), 887 So.2d 131, 137-138, writ denied, 04-2802 (La.3/18/05), 896 So.2d 999; Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Himel, 04-274 at 8, 887 So.2d at 137-138; Rosell, 549 So.2d at 844. The issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether its conclusion was a reasonable one. Himel, 04-274 at 8, 887 So.2d at 138; Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Himel, 04-274 at 8, 887 So.2d at 138; Stobart, 617 So.2d at 882. Only where the documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the witness's story, may the court of appeal find manifest error, even in a finding purportedly based upon a credibility determination. Himel, 04-274 at 8, 887 So.2d at 138; Rosell, 549 So.2d at 844-45.
The physical evidence in this case casts doubt on the recollections of January and Gattuso, but supports the testimony of Timmons. Timmons' DWI history is not sufficient alone to question his credibility when the physical evidence supports it. Thus, we find no manifest error by the trial judge in believing his testimony. Further, we find the trial judge did not err in accepting the expert testimony of Winkler. His explanations for his conclusions are credible based on the physical evidence, the police report, and the testimony of Timmons and the Plaintiff. Thus, we find that the trial judge did not err in finding that the Plaintiff had the right of way and that Baxter was solely at fault in the accident.

FUTURE MEDICAL EXPENSES
The Parish contends that the award for medical expenses included an amount for future medicals, which is not supported by the evidence. The parties stipulated that the Plaintiff incurred $12,930.50 in past medical expenses. At trial, the Plaintiff testified that Dr. Mortezia Shamsnia, a board certified neurologist, treated her after the accident. He diagnosed her with post-concussion symptoms, headaches and short-term memory loss, herniated discs in her back and neck, and *427 upper and lower extremity radiculapothies. He recommends that she undergo two diagnostic tests related to her concussion, a sleep study and a neuropsychological evaluation. Dr. Shamsnia's medical report dated September 18, 2002 and his prescriptions for those tests were admitted into evidence. The Plaintiff testified that she intends to have the tests, but due to her diminished financial capacity, could not afford them prior to trial. She testified that the tests will cost approximately $6,000.
In order to recover future medical benefits, the Plaintiff must prove that these expenses will be necessary and inevitable. Aguillard v. Meiners, 03-311, p. 3 (La.App. 5th Cir.9/16/03), 857 So.2d 1034, 1035, writ denied, 03-2891 (La.1/9/04), 862 So.2d 987. Future medical expenses must be established with some degree of certainty and generally must be supported with medical testimony and estimation of probable costs. Id. However, the award can be made despite the fact that no dollar estimate was made by experts at trial. Aguillard, 03-311 at 3, 857 So.2d at 1035; See: Guillory v. Avondale Shipyards, Inc., 448 So.2d 1281, 1287 (La. 1984).
The trial judge accepted the Plaintiff's estimate of the future medical costs, based on information she received from the medical personnel in making her decision as to whether she could afford the tests. After our review, we find no abuse of the trial judge's discretion in awarding the Plaintiff $6,000 for future medical expenses.

GENERAL DAMAGES
The Parish contends that the trial judge erred in awarding the Plaintiff $215,000 in general damages, since her medical expenses were only $18,930.50, the Plaintiff already recovered $47,000 in settlement with State Farm and considering similar cases.
The standard for the review of damage awards is whether, after an articulated analysis of the facts, the appellate court finds that the trial judge abused his great discretion. Simmons v. CTL Distribution, 03-1301, p. 11 (La.App. 5th Cir.2/23/04), 868 So.2d 918, 926, writs denied, 04-0743 and 04-0764, (La.5/14/04), 872 So.2d 524; Farrell v. Pierre, 02-1136, p. 9 (La.App. 5th Cir.4/8/03), 846 So.2d 49, 55; Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). This determination is made with consideration to the individual circumstances of an injured plaintiff. Simmons, 03-1301 at 11, 868 So.2d 926; Farrell, 02-1136 at p. 9, 846 So.2d at 55; Theriot, 625 So.2d at 1340. After an analysis of the facts and circumstances peculiar to the particular case and a particular plaintiff, an appellate court may conclude that the award is inadequate (or excessive). Simmons, 03-1301 at 11-12, 868 So.2d 926; Farrell, 02-1136 at p. 9, 846 So.2d at 55; Theriot, 625 So.2d at 1340. Only then does the appellate court resort to prior awards, and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Simmons, 03-1301 at 12, 868 So.2d 926; Farrell, 02-1136 at p. 9, 846 So.2d at 55; Theriot, 625 So.2d at 1340.
At the time of trial, the Plaintiff was 50 years old and overweight. However, prior to the accident, she was in good health and worked three jobs. She owns a courier service with her son, working five to six days per week. She stated that she could pick up heavy objects such as 4 x 8 sheets of plastic for a chemical company client, and could lift heavy food trays for bulk catering delivery from her long-time customer, Corky's Bar-B-Q. The Plaintiff could drive various sized trucks, some of which are high and require her to climb into the cab. She also worked in residential *428 pest control and did home selling of various products. Her elderly parents are financially dependent upon her because her father has Alzheimer's disease and her mother is his caretaker. She was active with her grandchildren. She had no problems with her neck and back prior to the accident, other than the symptoms that resolved in 1992.
The impact caused the Plaintiff to become trapped in her van. She was unable to move until the paramedics arrived and pulled her through a window. She was in pain, shaking and crying. Her vision was blurry. Her head, neck, arm, leg, shoulders and back hurt. At the emergency room, she developed a bad headache and leg cramps. She was released with pain medications. For two months following the accident, the Plaintiff could not move without help. She could not work and needed assistance to bathe and attend to her personal needs.
The Plaintiff did not request an award for lost wages. However, her loss of income has impacted her life. After the accident, the Plaintiff could not work for two months. She still cannot perform pest control work because of the bending required. Selling products is also a problem because it requires standing. She can make light deliveries, but now spends more time in her office at her home. The Plaintiff noted that she has no medical insurance and her settlement proceeds are being used for daily living expenses.
The Plaintiff testified that she still has daily neck and back pain, but notes that it waxes and wanes. She has residual numbness in her hands and from her neck to her arms and her head still hurts when touched on the left side. She continues to have headaches and short term memory loss. Plaintiff became frustrated with her lack of progress and became depressed. The Plaintiff has also developed sleep problems. In addition, she cannot enjoy activities with her grandchildren and cannot do "fun" things with them. She takes muscle relaxants every day and does home exercises to help her sleep. She admitted that, in 1992 she overdosed on pain medications taken for the injuries in the 1991 accident, but explained that it was accidental, although the medical report listed the event as an attempted suicide.
The Parish presented a surveillance video of the Plaintiff picking up a delivery at Corky's Bar-B-Q after the accident. The Plaintiff explained that the Corky's Bar-B-Q employees usually put the food trays in her van. Because they were busy, she put her hand truck (dolly) in the van. However, that was within her capability since the dolly only weighs 20-25 lbs. She was told not to pick up anything over 40 lbs. She also explained a portion of the surveillance video showing her picking up a newspaper and getting in and out of her car at her home office. She stated that she can bend, but that it hurts. The Plaintiff noted that the surveillance video does not show her pain while doing these things and does not show her in pain at night or at home when she is resting.
The Plaintiff's medical bills and expenses were admitted into evidence by stipulation. The parties agreed to submit Dr. Hamsa's testimony via video deposition.
The evidence shows that, as a result of the accident, the Plaintiff sustained two ruptured discs, one at C4-5, and the other at L5-S1, a bulging disc at C5-6, desiccation (loss of moisture) at L3-4 and L4-5, and an L-4-5 annulus, consistent with annular tear. The Plaintiff also sustained an impact fracture to her shoulder, a concussion, bruising and contusions. She has headaches, sleep and memory problems. She unsuccessfully attempted physical therapy from Dr. Stewart Altman, a general *429 surgeon from August 21, 2000 to November 19, 2000 and Dr. Michael Haydel, a chiropractor from April of 2003 through May of 2003. According to her orthopedic surgeon, Dr. Vaclav Hamsa, she will need, in the future, an anterior cervical fusion and lumbar laminectomy, but she needs to lose weight first. He assigned a 10% whole body impairment to the Plaintiff due to the injuries.
The Plaintiff was first seen by Dr. Hamsa in July of 2000, for her injuries in this accident. She subsequently was treated by him in July of 2000 September of 2000, and January 12, 2001. She had a lengthy phone discussion with him in March of 2001. She returned to Dr. Hamsa again in June, July, August, and September of 2003, and May of 2004. Dr. Hamsa has not discharged the Plaintiff from treatment because she has not reached maximum medical improvement. Dr. Hamsa concluded that the discs problems, apparent in the magnetic resonance imaging (MRI) following the accident, were more probably than not caused by the accident.
Dr. Hamsa treated the Plaintiff for an automobile accident in 1991. However, her MRI taken as a result of that accident were negative. Her injuries from that accident had resolved by July of 1992.
As noted earlier, Dr. Shamsnia also treated the Plaintiff. He saw her in July, August, October and December of 2001 and March, May, and September of 2002. Nerve conduction studies showed nerve root impingements and bilateral carpal tunnel syndrome. An MRI of her brain was normal. Dr. Shamsnia prescribed Zoloft to treat her depression. Again, he wants her to have the sleep study and neuro-psych test performed so he can evaluate her sleep and memory problems.
The Plaintiff attributed the time gaps in her treatment with Dr. Hamsa to no medical insurance and difficulty paying her medical expenses. The Plaintiff did not see him in 2002 because she was being treated by Dr. Shamsnia. She only goes back to Dr. Hamsa when she must because of the pain.
The Parish complains that the Plaintiff is exaggerating her injures and cites various cases. It also contends that this Court should review the medical evidence de novo because there was no live testimony. In addition, it complains that a reversal is warranted as a matter of law because the trial judge did not have the opportunity to review its post trial memorandum before issuing his judgment.
The term "general damages" refers to those damages which may not be fixed with any degree of pecuniary exactitude, but which involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Lousteau v. K-Mart Corp., 03-1182, p. 16 (La.App. 5th Cir.3/30/04), 871 So.2d 618, writ denied, 04-1027 (876 So.2d 835).
The standard for reviewing evidence in the form of depositions, written reports, or records is manifest error. Shephard on Behalf of Shepard v. Scheeler, 96-1690, p. 15 (La.10/29/97), 701 So.2d 1308, 1317, reaffirming Virgil v. American Guar. Liab. Ins. Co., 507 So.2d 825 (La.1987). Thus, the Defendant's argument that we should not defer to the trial judge's findings on damages, but conduct a de novo review, lacks merit.
The evidence shows that the Plaintiff sustained a fractured shoulder, two disc ruptures, a bulging disc, a concussion, contusions and multiple bruises in the accident. She has residual post-concussion syndrome, headaches, memory and sleep *430 problems. The abnormal discs are impinging on her nerve roots. The Parish did not produce any contrary medical evidence to dispute these findings. In addition, there is nothing in the record to indicate that the Plaintiff is exaggerating her residual pain. Thus, the objective medical evidence supports the Plaintiff's allegations of on-going pain.
In addition, the Plaintiff suffered through a severe impact that caused her van to travel 50 feet from point of impact and flip over on its side. She was pinned in her van and in pain until help arrived. She was afraid she was going to die and was emotionally distraught. The paramedics pulled her through the van window, increasing her pain. According to the Plaintiff, her lifestyle has been severely affected by her on-going problems. She is depressed and frustrated by the lack of progress in alleviating them. Her parents are financially dependent on her and her anxiety level has increased as her financial situation has decreased. The Plaintiff was a hard-working person prior to the accident. She became depressed dealing with her limitations. She is an overweight woman, but was well able to care for herself and her family prior to the accident. The trial judge found that her testimony was credible. Based on her multiple injuries, as well as the limitations imposed by her residual problems, we find no abuse of the trial judge's discretion in the award for general damages.
We also find no merit to the Parish's allegation that the trial judge did not have an opportunity to review its post-trial memorandum before issuing his judgment, or that this failure is an error of law requiring reversal. The memorandum was filed September 13, 2004. The judgment was signed on September 24, 2004. Although it was omitted from this Court's record, the pleading was officially clocked in the district court's clerk's office. We cannot assume that the trial judge did not consider it. Furthermore, a post-trial memorandum is argument, not evidence. Even if the trial judge had not seen the memorandum, that would not have any bearing on whether the evidence supports the judgment.

REVERSIONARY TRUST FOR FUTURE MEDICALS AND SPECIFICATION OF COURT COSTS
The Parish also contends that the trial judge erred in failing to order the establishment of a reversionary trust for the future medicals, pursuant to La.R.S. 13:5106 B.(3), and in failing to specify the amount of court costs as required in suits against the Parish under R.S. 13:5112. The Parish is correct on both issues.
La.R.S. 13:5106 limits recovery for personal injury and wrongful death in cases against the State, its agencies or political subdivisions. If future medical expenses are awarded, R.S. 13:5106 B(3)(a) provides that the court must established a reversionary trust for the benefit of the claimant, out of which all future medical expenses are to be paid.[1] The statute also regulates the procedure for such a trust. In addition, R.S. 13:5112 requires the trial *431 judge to specify a dollar amount of court costs when awarded against the state or political subdivisions. Thus, we must remand the matter to the trial court for compliance with the requirements of La.R.S. 13:5106 B(3)(a) and R.S. 13:5112.
Accordingly, the judgment of the trial court is hereby affirmed as to liability, the amount of damages and the assessment of costs against the Parish. The case is remanded for compliance with the provisions of La.R.S. 13:5106 B(3)(a) for the establishment of a reversionary trust, and for compliance with La.R.S. 13:5112, relative to fixing the amount of court costs assessed against the Parish.
AFFIRMED AND REMANDED.
NOTES
[1] La.R.S. 13:5106 B.(3)(a) and (b) provides:

"the court shall order that a reversionary trust be established for the benefit of the claimant and that all medical care and related benefits incurred subsequent to judgment be paid pursuant to the reversionary trust instrument. The reversionary trust instrument shall provide that such medical care and related benefits be paid directly to the provider as they are incurred. Nothing in this Paragraph shall be construed to prevent the parties from entering into a settlement or compromise at any time whereby medical care and related benefits shall be provided, but with the requirement of establishing a reversionary trust."
(b) Any funds remaining in a reversionary trust that is created pursuant to Subparagraph (3)(a) of this Subsection shall revert to the political subdivision that established the trust, upon the death of the claimant or upon the termination of the trust as provided in the trust instrument. The trustee may obtain the services of an administrator to assist in the administration of the trust. All costs, fees, taxes, or other charges imposed on the funds in the trust shall be paid by the trust. The trust agreement may impose such other reasonable duties, powers, provisions, and dispute resolution clauses as may be deemed necessary or appropriate. Disputes as to the administration of the trust can be appealed to the district court. Nothing in this Paragraph shall preclude the political subdivision from establishing other alternative funding mechanisms for the exclusive benefit of the claimant. The terms and conditions of the reversionary trust instrument or other alternative funding mechanism, prior to its implementation, must be approved by the court. The parties to the case may present recommendations to the court for the terms and conditions of the trust instrument or other funding mechanism to be included in the order. Upon request of either party, the court shall hold a contradictory hearing before granting a final order implementing the reversionary trust or the alternative funding mechanism. [Emphasis added.]