# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 07-409

WOODROW WILSON, ET AL.

VERSUS

THE TOWN OF MAMOU, ET AL.

**************

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, DOCKET NO. 65721-A
HONORABLE J. LARRY VIDRINE, DISTRICT JUDGE

*************
**SYLVIA R. COOKS**
**JUDGE**
*************

Court composed of Sylvia R. Cooks, Marc T. Amy, and Elizabeth A. Pickett, Judges.

Amy, J., concurs in the result and assigns written reasons.

**JUDGMENT AFFIRMED AS AMENDED.**

**Jonathan C. Vidrine**
**510 W. Magnolia Street**
**Ville Platte, Louisiana 70586**
**(337) 363-2772**
**COUNSEL FOR PLAINTIFFS:**
        **Woodrow Wilson, et al.**

**Lisa E. Mayer**
**John F. Wilkes**
**Joy C. Rabalais**
**Dayna M. Edwards**
**Lana Duhon**
**200 West Congress Street, Suite 1000**
**Post Office Box 4305**
**Lafayette, Louisiana 70502-4305**
**(337) 232-1604**
**COUNSEL FOR DEFENDANTS:**
        **Town of Mamou and Chief Herman Celestine, in his official**
        **capacity as Chief of Police of the Town of Mamou**

**COOKS, Judge.**

## STATEMENT OF THE CASE

The Town of Mamou and the Chief of Police, Herman Celestine, appeal the judgment of the trial court finding the Town liable for damages for the death of Yvette Michelle Wilson. The plaintiffs appeal asking for an increase in wrongful death damages and survival damages. We affirm the judgment of the trial court on liability but find the trial court erred in failing to assign any percentage of fault to the perpetrator of the murder, Harry Richard, Jr. Accordingly, we amend the judgment of the trial court to reflect Richard is 50% at fault in the death of Ms. Wilson and increase the wrongful death damages to $150,000 for each of the four children. We also award $50,000 for survival damages.

## STATEMENT OF THE FACTS

This case arises out of a murder/suicide which occurred in the small town of Mamou, Louisiana. On December 10, 2003 at approximately 12:50 p.m. Conray Frank heard screams coming from his neighbor's home. He ran over to lend assistance and found Yvette Michelle Wilson on the ground in the yard holding her new baby. She was badly beaten, bruised and bleeding from cuts on her face. Mr. Frank learned the perpetrator was her boyfriend, and the father of her four children, Harry Richard, Jr. Mr. Frank immediately called the police and Richard fled the scene. Lt. Charles "Tiny" Israel of the Mamou police department responded to the call. When Lt. Israel arrived, he saw Ms. Wilson was bruised and bleeding. He testified he proceeded with caution because he "was worried that maybe the boyfriend was still there." Lt. Israel asked Mr. Frank to take Ms. Wilson to the police station while he "made the block" to look for Richard. Unable to locate Richard, he returned to the police station to fill out the paperwork and take pictures of Ms. Wilson's

battered condition. Lt. Israel clearly assessed the seriousness of the threat to Ms. Wilson and recognized his responsibility to protect her. He testified Ms. Wilson communicated to him that she believed Richard was dangerous and she wanted him arrested and kept in jail because she feared for her life. Lt. Israel testified:

> It's because she was so scared to death that that man was gonna walk in to the police station and kill her, and I kept her in my office and I said you have to [press charges], and then it's my duty as a police officer to see when someone's brutalized like she was to take the appropriate action and put a warrant out on him.

Lt. Israel testified the police department was shorthanded at the time of the incident. However, the record reflects there were several other officers on duty and in the police station at the time of the incident but Lt. Israel did not communicate any urgency in apprehending Richard. Both Detective Todd Otis and Chief of Police Herman Celestine testified they would have assisted Lt. Israel in locating Richard or escorting Ms. Wilson to safety if they had been asked. After filling out the required forms, Lt. Israel called Faith House in Lafayette to secure placement for Ms. Wilson and her four children. Although, Lt. Israel testified Ms. Wilson was not interested in going to Faith House, this assertion was flatly refuted by Jackie Anderson of Faith House, who testified Ms. Wilson was scared and wanted shelter from Richard. Ms. Anderson stated Ms. Wilson was concerned for the welfare of her children and intended to go to Faith House, that day, as soon as she was able to pick her children up from school. Ms. Anderson testified based on her conversation with Ms. Wilson, Faith House began making arrangements for her arrival.

Ms. Wilson then called her mother, Laura, to come down to the police station. Ms. Wilson remained at the police station until approximately 3:00 p.m. She left with her mother, and without police protection, to gather her children from school and to begin preparations to flee to Faith House. Lt. Israel chose not to accompany her

to her mother's house but instead sent Patrolman Al Moore to secure a warrant from the duty judge for Richard's arrest. Two hours later at approximately 5:00 p.m., while Officer Moore was busy getting a warrant, and Lt. Israel was going off duty, Richard appeared at Ms. Wilson's mother's house, brandishing a gun. There was pandemonium in the house as other family members tried in vain to protect Ms. Wilson, and her children. Richard stormed through the house and found Ms. Wilson in the hall. He shot twice and missed. He chased her outside into the yard, and shot her in the back. Ms. Wilson died shortly thereafter. After killing Ms. Wilson, Richard turned the gun on himself.

Woodrow and Laura Wilson filed a wrongful death and survival action on behalf of their daughter, Yvette Michelle Wilson, and her four children against the Town of Mamou and Herman Celestine, in his official capacity as Chief of Police. The petition alleged the police officers of the Town of Mamou breached their duty in failing to detain and arrest Harry Richard, Jr. knowing he was a danger to Ms. Wilson, failing to escort her to safety pending the arrest of Richard, failing to adopt proper police procedures and failing to properly train police officers regarding their duty to protect victims of domestic violence. Following a bench trial, the trial court found the police officers negligent and awarded $60,000 in damages to each of Ms. Wilson's four children and $5,465.80 for funeral expenses.

## LAW AND DISCUSSION

### *Immunity of the Town of Mamou*

We find no merit in the Town of Mamou's assertion that it is immune from the imposition of liability due to either La.R.S. 46:2142 or La.R.S. 9:2798.1. The former statute provides that: "Any law enforcement officer reporting in good faith, exercising due care in the making of an arrest or providing assistance pursuant to the provisions

of R.S. 46:2140 and 2141 shall have immunity from any civil liability that otherwise might be incurred or imposed because of the report, arrest, or assistance provided." La.R.S. 46:2142. However, in this case, liability does not stem from the report, arrest or assistance provided. Rather, it is related to the failure to assist. Neither is La.R.S. 9:2798.1(B) applicable in this situation as the statute provides: "Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their *policymaking or discretionary acts* when such acts are within the course and scope of their lawful powers and duties." (Emphasis added.) Louisiana Revised Statutes 46:2140 is a legislative mandate and, thus, its requirements on the part of the officer are neither policymaking nor within his or her discretion. Accordingly, we find the immunity statutes inapplicable.

### Standard of Review

A trial court's findings of fact may not be reversed absent manifest error or unless it is clearly wrong. *Stobart v. State of Louisiana, through Dep't of Transp. and Dev.*, 617 So.2d 880 (La.1993). When reviewing the trial court's findings of fact, the appellate court must review the entire record to determine whether the trial court's conclusion was a reasonable one. *Id.* If the trial court's findings are "reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as a trier of fact, it would have weighed the evidence differently." *Id.* at 882. We have reviewed the record and find the testimony amply supports the decision of the trial court finding liability on the part of the Town of Mamou in the death of Ms. Wilson.

### Liability of the Town of Mamou

The liability of the Town of Mamou is analyzed under the duty-risk theory of recovery. *Hardy v. Bowie*, 98-2821 (La. 9/8/99), 744 So.2d 606. Under the duty-

risk analysis, the plaintiff must prove the conduct in question was a cause-in-fact of the harm, the defendant owed a duty to the victim, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached. *Hardy,* 744 So.2d 606; *Berry v. State, through Dep't of Health and Human Res.*, 93-2748 (La. 5/23/94), 637 So.2d 412. Whether a duty is owed to the plaintiff is a question of law. *Stroik v. Ponseti*, 96-2897 (La. 9/9/97), 699 So.2d 1072, *citing Faucheaux v. Terrebonne Consol. Gov't*, 615 So.2d 289 (La. 1993); *Hardy,* 744 So.2d 606.

The duty of a police officer in a domestic abuse situation is found in Louisiana Revised Statutes 46:2140. When a police officer has reason to believe a family member, household member or dating partner has been abused, the officer "*shall immediately* use all reasonable means to prevent further abuse[.]" La.R.S. 46:2140(A)(emphasis added). Reasonable means include: (1) arresting the perpetrator, in the case of a felony, with or without a warrant; (2) assisting the victim in obtaining medical treatment necessitated by the battery; (3) arranging for, or providing, or assisting in the procurement of transportation for the abused person to a place of shelter or safety; and, (4) notifying the abused person of his right to initiate criminal or civil proceedings, the availability of a protective order, and the availability of community assistance for domestic violence victims. La.R.S. 46:2140(A). This provision is part of the Protection from Family Violence Act and was prompted by the growing problem of domestic abuse in Louisiana. The Act authorizes the Department of Health and Human Resources to establish programs for the development of community based shelters for victims of family violence and provides funding for those programs.[1] Louisiana Revised Statutes 46:2131 provides

---

[1] The Statement of Purpose is found in La.R.S. 46:2121, and provides, in relevant part:
   A. The legislature hereby finds and declares that there is a present and growing

a "civil remedy" for the victims of domestic abuse. The legislature recognized law enforcement agencies were often not as aggressive in the enforcement of criminal laws when the battery occurred within the home. By providing a civil remedy, the legislature signaled a desire for a definite change in the policies and procedures of the police departments in the handling of abuse situations and a more aggressive prosecution of the perpetrators of domestic violence. Louisiana Revised Statutes 46: 2131 provides, in relevant part:

> The purpose of this Part is to recognize and address the complex legal and social problems created by domestic violence. The legislature finds that existing laws which regulate the dissolution of marriage do not adequately address problems of protecting and assisting the victims of domestic abuse. The legislature further finds that previous societal attitudes have been reflected in the policies and practices of law enforcement agencies and prosecutors which have resulted in different treatment of crimes occurring between family or household members and those occurring between strangers. It is the intent of the legislature to provide a civil remedy for domestic violence which will afford the victim immediate and easily accessible protection. Furthermore, it is the intent of the legislature that the official response of law enforcement

---

need to develop innovative strategies and services which will reduce and treat the trauma of family violence. Available studies documenting police statistics indicate that thousands of persons in this state are regularly beaten, tortured, and, in many cases, killed by spouses or persons with whom they are living in a primary relationship.

These studies further indicate that victims of family violence come from all socioeconomic classes and ethnic groups, though it is the poor who suffer most from family violence, since it is less likely that they have immediate access to private counseling and shelter for themselves and their children. Children, though often not physically assaulted, suffer deep and lasting emotional effects, and it is most often the children of those parents who commit family violence that perpetuate the cycle by abusing their spouses.

B. The legislature further finds and declares that there is a high incidence of deaths and injuries sustained by law enforcement officers in the handling of domestic disturbances. A definite correlation between family violence and marital homicide has been established, yet police arrests for family violence are low, and victims are reluctant to press charges. Furthermore, instances of family violence are considered to be the single most unreported crime in the state.

C. It is the intention of the legislature to achieve a reduction in serious and fatal injuries to the victims of family violence and to clarify the problems, causes, and remediation of family violence by providing that necessary services including shelter, counseling, and referrals to social services, medical care and legal assistance in the form of a family violence center.

agencies to cases of domestic violence shall stress the enforcement of laws to protect the victim and communicate the attitude that violent behavior is not excused or tolerated.

The issue presented is whether, considering the totality of the circumstances, without the benefit of hindsight, the police officers took reasonable measures to protect Ms. Wilson from harm. "Officers are held to choosing a course of action which is reasonable under the circumstances." *Latiolais v. Guillory*, 99-815, p.8 (La.App. 3 Cir. 11/3/99), 747 So.2d 675, 680, *quoting, Hardy*, 744 So.2d 606. This court in *Latiolais* addressed the liability of the sheriff's department for the death of a mother and her son at the hands of the estranged husband. In *Latiolais,* the deputy sheriff was called to the bus/camper of the victim to assist in removing the former spouse from the premises. The deputy found the couple in their undergarments in the camper. When asked to leave, the estranged husband was upset that the sheriff's department had been called but calmed down, got in his truck and drove off. The deputy then assisted the victim and her children with moving her clothes from the camper to her vehicle. He advised the victim to drive around while he informed her mother she would be staying with her that night. While the deputy was on the porch talking to the victim's mother, he heard shots and glass breaking. The deputy discovered the former husband had returned and shot the victim and her son in the vehicle. This court found the circumstances surrounding the incident did not alert the deputy that there was an "impending danger" to the victim. When called to the scene the deputy did not observe a fight or altercation. The perpetrator did not act in a violent way toward the deputy or the victim. The deputy had effectuated the removal of the former husband and was assisting the victim and her children to her vehicle.

The facts in the present case are distinguishable from the facts in *Latiolais.*

Lt. Israel was fully aware of the intensity of the situation based on the severity of the beating and Ms. Wilson's fear for her life. He immediately perceived Richard was a dangerous man and proceeded with caution, noting: "I was worried that maybe the boyfriend was still there." Lt. Israel also recognized his duty was two-fold: to protect the victim and apprehend the abuser. He testified:

> It's because she was so scared to death that that man was gonna walk in to the police station and kill her, and I kept her in my office and I said you have to [press charges], and then it's my duty as a police officer to see when someone's brutalized like she was to take the appropriate action and put a warrant out on him.

Although Lt. Israel recognized his responsibility, he made only a cursory attempt to locate Richard, did not ask for assistance in apprehending Richard, and allowed Ms. Wilson to leave the police station unescorted to gather her children and pack her belongings before going to Faith House. This he did despite the fact that he testified that Ms. Wilson was "[v]ery bloody, beat up, brutalized and, you know, in bad condition" and "she could barely move." He further confirmed Ms. Wilson had been "beat so badly, she was purely exhausted. Her emotional state was in an –just like in limbo. I mean – I mean, I don't think she could make – she could make a decision – you know, a good decision because she had been beat up so badly."

Chief of Police Herman Celestine acknowledged the Mamou police department has no policies or procedures for the handling of domestic violence cases. He admitted this was a failure on the part of the department: "We should have one, it should have been in the handbook." Chief Celestine testified it is customary in these types of situations for the police to escort the victim back to the house to pack clothes and prepare to leave. When asked why Lt. Israel did not escort Ms. Wilson to her mother's home, he stated:

> Well I think he should of, but I mean he was getting off, the other officer was coming on, he was getting off and he went to look for Harry Richard, probably if he could have find him before he gets back to her.

Chief Celestine stated he would have secured assistance in apprehending Richard while Ms. Wilson was in the protection of the police station. The plaintiff offered the testimony of Detective Todd Otis. Detective Otis testified he was in the station at the time Ms. Wilson came in and would have assisted Lt. Israel if asked. He also testified since this incident, under the new chief of police, the department implemented a new policy which requires the police officers to protect the victim until the perpetrator is arrested.

The plaintiff also offered the testimony of Officer Al Moore. He was asked by Lt. Israel to obtain a warrant for Richard's arrest. He testified:

> I came back to the police department and when I walked into the office I said to Mr. Israel I have the warrants signed and at the same time that's when the dispatcher came on that there had been a shooting at 817 9th Street.

The plaintiff offered the testimony of Dr. Wade Schindler, an expert in police procedure. Dr. Schindler is a professor of Criminal Justice and Criminology at Tulane University and president of Orleans Regional Security Institute, a consulting firm. Dr. Schindler opined the Town of Mamou was negligent for failure to adequately supervise, train and implement policies and procedures for the safety of the people of Mamou. Dr. Schindler testified Lt. Israel should not have allowed a neighbor to transport Ms. Wilson to the station and should not have allowed Ms. Wilson to leave without police protection until Richard was apprehended. Even the defendant's expert witness, Dr. Larry Gould, from the East Baton Rouge Parish Sheriff's office, acknowledged Lt. Israel was "not active" in procuring transportation for Ms. Wilson and ensuring her safety. Dr. Gould testified:

What I can say is the longer the police have her in their protection the longer that she's in the protection of somebody else, the less likelihood statistically, I don't know about her specific case, statistically the likelihood of an additional assault goes down, that's what the studies say.

In this case, the murder occurred within hours of the initial call to the police. It is within this critical time period, when passions have not cooled, that the likelihood of additional harm to the victim increases. Given the severity of the beating, and the fear of Ms. Wilson, it was foreseeable that Richard posed "an impending danger" to Ms. Wilson and Lt. Israel should have implemented measures to ensure her safety until Richard was apprehended. While the Mamou police department has no policies or procedures for the handling of these cases, Chief Celestine testified customarily the police escort the victim to her home to retrieve her clothes or to a place of safety. That was not done in this case. Lt. Israel allowed Ms. Wilson to leave the station unescorted while Richard was still at large. Moreover, we do not find Lt. Israel was aggressive in his search for Richard. He did not enlist the assistance of the officers on duty at the station at the time of the incident. Instead he made what the trial court described as only a "token effort to locate Harry Richard, Jr." [2]

Lt. Israel was not an inexperienced officer. He has worked in law enforcement for twenty-eight years and has routinely handled domestic abuse cases. However, the "business as usual" way of handling these cases is what the legislature is seeking to change. "Societal attitudes" which minimize the significance of

---

[2] Lt. Israel asserted for the first time at trial that he left the police station while Ms. Wilson was there to search for Richard. The trial court apparently did not find this statement credible and found Lt. Israel performed a "two or three minute search at the *outset* [and] no one did anything other than patrolman Al Moore who was at the home of Judge Thomas Fuselier seeking the Judge's signature on an arrest warrant while Harry Richard, Jr. was gunning down Michelle Yvette Wilson." Further, Al Moore testified when he secured the warrant and brought it to the station, Lt. Israel was at the station and not on patrol.

violence in the home "have been reflected in the policies and practices of law enforcement agencies . . . it is the intent of the legislature that the official response of law enforcement agencies to cases of domestic violence shall stress the enforcement of laws to protect the victim and shall communicate the attitude that violent behavior is not excused or tolerated." La.R.S. 46:2131. Police officers cannot always guarantee the safety of the victim, but they must take all reasonable measures under the circumstances to offer protection to the victim until the aggressor is apprehended or the officer is reasonably certain the situation is no longer dangerous. Under the circumstances presented in this case, we find Lt. Israel and the Mamou police department should have taken reasonable measures to escort Ms. Wilson to a place of safety until Richard was apprehended. Accordingly, we affirm the decision of the trial court finding liability on the part of the Town of Mamou.

The defendants assert the negligence of Ms. Wilson, Ms. Wilson's family and the intentional actions of Harry Richard as contributing factors in Ms. Wilson's death. We do not find Ms. Wilson was negligent in leaving the police station with her mother. The testimony by Ms. Anderson of Faith House and Laura Wilson, her mother, establish without a doubt that Ms. Wilson knew Richard was violent and it is reasonable to conclude she was afraid he may harm her children. Ms. Wilson's desire to gather her small children and take them with her to Faith House was not unreasonable under the circumstances. By leaving the station, she was doing the one thing every mother would do - protect and care for her children. The fact that Richard murdered Ms. Wilson in the presence of her family and then committed suicide demonstrates his instability and confirms that Ms. Wilson's fears were not unreasonable. [3] Moreover, we note Lt. Israel was fully aware that Ms. Wilson was in

---

[3] We note in *Latiolais,* 747 So.2d 675, the estranged husband in a fit of violent rage murdered both the wife and son.

no condition to make "a good decision because she had been beat up so badly." We specifically reject the assertion that Ms. Wilson's family could have prevented the tragedy which occurred. Ms. Wilson was taken to her mother's home as a temporary shelter to gather her children before leaving for Faith House. When Richard arrived he was brandishing a gun and began shooting in the house. Ms. Wilson had just come from the police station. It was the police department's responsibility, not the family's, to protect Ms. Wilson. We find no merit in this argument. However, we find the trial court erred in failing to assign fault to Richard in causing the death of Ms. Wilson. While the police officers did not take reasonable measures to protect Ms. Wilson, that action alone would not have resulted in the death of Ms. Wilson without Richard's participation. *See, e.g. Waters v. Brookshire Grocery Company*, 07-203 (La.App. 3 Cir. 11/7/07), __So.2d __; *Brock v. Winn Dixie Louisiana, Inc.*, 617 So.2d 1234 (La.App. 3 Cir. 1993), *writ denied*, 617 So.2d 1234. Accordingly, we amend the judgment to reflect Harry Richard, Jr. is 50% at fault.

### *Damages*

The plaintiffs assert the trial court erred in failing to award survival damages in this case. The medical testimony indicates that Ms. Wilson was dead upon her arrival at Savoy Medical Center. In support of the survival action, the plaintiffs submitted the testimony of Ms. Wilson's sister who stated Ms. Wilson took a silver ring from her finger, gave it to her and said "bye." Even though the trial court obviously found the sister's testimony was not credible, the record clearly establishes, as borne out by the witnesses, that several minutes prior to the fatal shooting, Ms. Wilson was fully aware Richard had entered the home with a gun and was searching for her. She had to be in extreme fear for her life as he chased her through the house

and fired two shots. Her fear and anxiety, no doubt, intensified when she realized Richard was only a few steps behind her and was within firing range. It is reasonable to conclude she knew her death was imminent. "The survival action in a suit resulting from the death of a tort victim includes recovery for pain and suffering, loss of earnings and other damages sustained by the decedent up to moment of death." *Prince v. Mattalino*, 583 So.2d 541, 543 (La.App. 3 Cir. 1991). "Damages for pain and suffering are properly awarded if there is a scintilla of evidence of any suffering or pain or the part of the deceased by his actions or otherwise." *Id.* The trial court erred in failing to award any survival damages in this case. We find an amount of $50,000 is a reasonable amount for survival damages.

The trial court awarded $60,000 to each of the children for the wrongful death of their mother. The elements of damage for a wrongful death action are loss of love, affection, companionship, services and loss of support, medical expenses and funeral expenses. *Simmons v. CTL Distrib.*, 03-1301 (La.App. 5 Cir. 2/23/04), 868 So.2d 918. Wrongful death awards may be based on the degree of affection with the deceased, the amount of guidance needed by the minor child and the closeness of the family relationship. *Williams v. City of Monroe,* 27,065 (La.App. 2 Cir. 7/3/95), 658 So.2d 820, *writ denied*, 664 So.2d 451,452. An appellate court may disturb an award of damages only when the record clearly shows that the factfinder abused its broad discretion in making the award. *Scott v. Pyles*, 99-1775 (La.App. 1 Cir. 10/25/00), 770 So.2d 492, *writ denied*, 782 So.2d 633. After a determination that an award constitutes an abuse of discretion based on the particular injuries sustained and their effect on the particular injured person, the appellate court may reduce or increase the award to the highest or lowest amount reasonably within the factfinder's discretion. *Wilson v. Nat'l Union Fire Ins. Co.*, 27,702 (La.App. 2 Cir. 12/6/95), 665 So.2d 1252.

Ms. Wilson had four surviving children, under the age of six. The baby was only three weeks old at the time of the shooting. Laura Wilson, Ms. Wilson's mother, testified regarding the close relationship the children had with their mother. She stated the older child is going to counseling twice a week since the death of his mother. All four children will be deprived of the love, affection and the support of their mother for their entire live. We have reviewed the case law and find the lowest reasonable recovery for the wrongful death of a mother, given the ages of the children, is $150,000 to each child. *See McGrail v. Lee,* 35,756 (La.App. 2 Cir. 4/3/02), 814 So.2d 729, which affirmed a jury award of $750,000 each to three children, ages nine, eighteen, and twenty-one. The court found the award "approach[es], but do[es] not exceed the highest amount reasonably within the broad discretion of the jury." *Id.* at 736. In *Simmons*, 868 So.2d 918, the court affirmed an award of $300,000 to the child; *See also Brooks v. City of Baton Rouge*, 558 So.2d 1177 (La.App. 1 Cir. 1990), *writ denied*, 566 So.2d 982. Plaintiff correctly points out in *Ford v. State, through Dep't of Transp. and Dev.,* 99-1297 (La.App. 3 Cir. 4/12/00), 760 So.2d 478, *writ denied,* 00-1935 (La. 9/27/00), 769 So.2d 1214, *writ denied*, 00-1864 (La. 9/29/00), 770 So.2d 350, *writ denied*, 00-1938 (La. 9/29/00), 770 So.2d 352, this court awarded $150,000 to a daughter for the wrongful death of her seventy-five year old mother and in *Monk v. State, through Dep't of Transp. and Dev.*, 05-97 (La.App. 3 Cir. 6/29/05), 908 So.2d 688, *writ granted*, 05-2337(La. 3/24/06), 925 So.2d 1238, *order recalled*, 05-2337 (La. 10/17/06), 940 So.2d 642, this court awarded the children $500,000 for the death of their mother. Accordingly, we amend the judgment to increase the award to $150,000 to each child.

## DECREE

Based on the foregoing review of the record, we affirm the decision of the

-14-

trial court finding liability on the part of the Town of Mamou. We amend the judgment to reflect Harry Richard, Jr. is 50% at fault in causing the death of Ms. Wilson and we increase the damage award for the wrongful death of Ms. Wilson to $150,000 to each child. We award $50,000 for survival damages. In all other respects the judgment is affirmed. All costs of this appeal are assessed to the Town of Mamou.

**JUDGMENT AFFIRMED AS AMENDED**.

NUMBER 07 - 409

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

WOODROW WILSON, ET AL.

VERSUS

THE TOWN OF MAMOU, ET AL.

AMY, J., concurring in the result.

I respectfully concur in the result. This is an instance in which the legislature has provided instruction to law enforcement to use "all reasonable means to prevent further abuse." However, the question of what particular actions constitute "all reasonable means" remains an open one for the courts. This is particularly true where the police are not exercising custodial control over the victim.

Here the trial court was faced with a situation in which the police officer offered medical treatment or assistance with contacting a shelter, but the victim either refused or decided not to pursue further assistance. Nevertheless, given the testimony surrounding Miss Wilson's time at the police department and her return to her mother's home, the trial court could have concluded that the police officer's assistance was simply inadequate. The record supports a determination that the officer failed to explain the immediacy and danger of not reporting to the shelter to either the victim or her mother. It also supports a finding that the department could have reasonably offered further protection in transport to the shelter and that the failure to do so was a cause of Miss Wilson's death. Thus, I find that the imposition of liability on the Town of Mamou must be affirmed.

I join in the majority's determinations regarding statutory immunity, apportionment of fault, and assessment of damages.